101 Cal.Rptr.2d 718 (2000)
24 Cal.4th 627
12 P.3d 1125
Alan O. AAS et al., Petitioners,
v.
The SUPERIOR COURT of San Diego County, Respondent;
William Lyon Company et al., Real Parties in Interest.
Provencal Community Association, Petitioner,
v.
The Superior Court of San Diego County, Respondent;
William Lyon Company et al., Real Parties in Interest.
No. S071258.
Supreme Court of California.
December 4, 2000.
*719 Procopio, Cory, Hargreaves & Savitch, Steven M. Strauss, Edward I. Silverman and Victor M. Felix, San Diego, for Petitioners Alan O. Aas et al.
Epstein & Grinnell, Douglas W. Grinnell, San Diego, Luis E. Ventura, El Centro; The Law Offices of Duane E. Shinnick, Silldorf, Shinnick & Duignan and Duane E. Shinnick, San Diego, for Petitioner Provencal Community Association and for Consumer Attorneys of California as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.
Ian Herzog, Santa Monica; Douglas Devries, Sacramento; Roland Wrinkle, Woodland Hills; Harvey R. Levine, San Diego; Robert Steinberg, Los Angeles; Thomas G. Stolpman, Long Beach; William D. Turley, San Diego; Mary E. Alexander, Menlo Park; Joseph Harbison III, Sacramento; Bruce Broilett; Wayne McClean, Woodland Hills; Leonard Sacks, Granada Hills; Tony Tanke, Redwood City; Lea-Ann Tratten; Steven J. Kleifield, Los Angeles; David Rosen; Moses Lebovits, Los Angeles; Christine Spagnoli; James Sturdevant, San Francisco; Daniel Smith; Deborah David, Los Angeles; Lawrence Drivon; Thor Emblem, Escondido; Rick Simons; David Casey, Jr., San Diego, Kasdan, Simonds, McIntyre, Epstein & Martin and Kenneth S. Kasdan, Irvine, for Consumer Attorneys of California as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.
*720 Verboon, Whitaker & Peter, Mark A. Milstein and Michael T. Whitaker, Los Angeles, for Southern California Apartment Owners Association as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.
Wolf, Rifkin & Shapiro, Leslie S. Marks, Los Angeles, and Douglas A. Lusson, San Diego, for League of California Homeowners as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.
Berding & Weil and James O. Devereaux, Alamo, for the Executive Council of Homeowners as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.
Berger & Hopkins, Jane Francis Hopkins and A. Alan Berger, San Jose, for the Structural Engineers Association of California as Amicus Curiae on behalf of Petitioners Alan O. Aas et al.
Orbach & Huff, David M. Huff and Eric P. Weiss, Los Angeles, for Coalition of American Structural Engineers, Park Purdue Homeowners Association, Angelina Heights Homeowners Association and Silverado Oaks Homeowners Association as Amici Curiae on behalf of Petitioners Alan O. Aas et al.
Williams, Wester, Hall & Nadler and Scott A. Williams, Greenbrae, as Amici Curiae on behalf of Petitioners Alan 0. Aas et al.
Burdman & Benson and Linda Angle-Keny, San Diego, as Amici Curiae on behalf of Petitioners Alan 0. Aas et al.
No appearance for Respondent.
Newmeyer & Dillion, Gregory L. Dillion, Timothy S. Menter, Gene M. Witkin, Newport Beach; Lincoln, Gustafson & Cercos, Thomas J. Lincoln and Charles K. Egan, San Diego, for Real Parties in Interest the William Lyon Company and Lyon Communities, Inc.
Dale, Braden & Hinchcliffe and Suzanne M. Martin, for Real Parties in Interest Ben F. Smith, Inc., and B & L Plastering.
Wilson, Elser, Moskowitz, Edelman & Dicker, Andrew J. Blackburn, Long Beach, and William S. Roberts, San Diego, for Real Parties in Interest West Coast Sheet Metal, Inc., and Ben F. Smith, Inc.
Kring & Brown, Jeffrey A. Lake, San Diego, and Jon H. Van de Grift, for Real Parties in Interest Ben F. Smith, Inc., and New Continental Tile & Marble Co., Inc.
Maxie Rheinheimer Stephens & Vrevich, Barry M. Vrevich, Darin L. Wessel, San Diego, Kelegian & Thomas and Michael Paul Thomas, Newport Beach, for Real Party in Interest Branco Corporation.
Bullard & Olin, Robert M. Granafei and Lee H. Graham, Orange, for Real Party in Interest Cal West Nurseries, Inc.
Brownwood, Rice & Zurawski and Michael F. Saydah, San Diego, for Real Parties in Interest C.R.E. Electric and Ghianni Corporation.
Acker, Kowalick & Whipple, Anthony H. Whipple, W. Frederck Kowalick, Linwood Warren, Jr., Catherine L. Rhodes and Tawnya L. Southern, for Real Party in Interest Premier Window Products, Inc.
Farmer, Weber & Case, David Weber; The Law Office of Mark Siegel and Mark Siegel, for Real Party in Interest Sun Plumbing Company, Inc.
Kolod, Wager & Gordon, Scott M. Kolod, Jerome A. Wager, San Diego, Vekeno Kennedy; Law Offices of Elisa J. Nemeth and Elisa J. Nemeth, for Real Party in Interest Allstate Plumbing.
Cozad & Krutcik and Ronald J. Cozad, Mission Viejo, for Real Party in Interest Schmid Insulation Contractors, Inc.
Berger, Kahn, Safton, Moss, Figler, Simon & Gladstone, Timothy A. Nicholson and Stephen L. Weber, Irvine, for Real Party in Interest Surecraft Supply, Inc.
Perkins & Miltner, San Diego, and Timothy E. Salter, for Real Party in Interest Bowers Construction Co.
Callahan, McCune & Willis and Norma Marshal, San Diego, for Real Party in Interest Frank Bowers Construction.
*721 Balestreri, Pendleton & Potocki, Thomas A. Balestreri, Jr., Mary B. Pendleton, Michael M. Freeland, San Diego, Maurine P. Brand; Kring and Brown, Irvine, and Jeffrey A. Lake, San Diego, for South Coast Framers, Inc., Alta Drywall, Inc., West Coast Sheet Metal and D.J. Drywall, Inc., as Amici Curiae on behalf of Real Parties in Interest.
Lewis, D'Amato, Brisbois & Bisgaard, Costa Mesa, Robert V. Closson, San Diego, Terrell A. Quealy and Judith A. Lewis for United National Insurance Company as Amicus Curiae on behalf of Real Parties in Interest.
John H. Findley, Sharon L. Browne, Sacramento, and Stephen R. McCutcheon, Jr., for Pacific Legal Foundation as Amicus Curiae on behalf of Real Parties in Interest.
Dale, Braden & Hinchcliffe, George D. Dale, Suzanne M. Martin; Perkins & Miltner, San Diego, Timothy E. Salter; and Kathryn Turner-Arsenault, Escondido, for the Construction Defect Defense Action Coalition as Amicus Curiae on behalf of Real Parties in Interest.
Fred J. Hiestand, Sacramento, for the Association for California Tort Reform as Amicus Curiae on behalf of Real Parties in Interest.
COX, Castle & Nicholson, Sandra C. Stewart, Jeffrey D. Masters, Debbie L. Freedman, Los Angeles; Gray, Cary, Ware & Freidenrich, San Diego, and Jonathan B. Sokol, Los Angeles, for the Building Industry Legal Defense Foundation and the California Building Industry Association as Amici Curiae on behalf of Real Parties in Interest.
White, Gentes & Garcia, Timothy S. Noon and Charles R. Bongard, San Diego, for the Associated General Contractors of America, San Diego Chapter, Inc., as Amicus Curiae on behalf of Real Parties in Interest.
Thelen Reid & Priest, Gary L. Fontana, Hilary N. Rowen, James A. Riddle, San Francisco; Craig A. Berrington and Laura L. Kersey, Washington, D.C., for American Insurance Association as Amicus Curiae on behalf of Real Parties in Interest.
Parker & Stanbury, Jenna L. Price and Mary-Tyler Crenshaw, for West Coast Sheet Metal and H & D Construction as Amici Curiae on behalf of Real Parties in Interest.
Morris, Polich & Purdy, Randy Koenig and Gary L. Jacobsen, San Diego, as Amici Curiae on behalf of Real Parties in Interest.
Gibbs, Giden, Locher & Turner, Barry C. Vaughan and Michael I. Giden, Los Angeles, for CalMat Co. as Amicus Curiae.
WERDEGAR, J.
In this case we are asked to decide whether homeowners and a homeowners association may recover damages in negligence from the developer, contractor and subcontractors who built their dwellings for construction defects that have not caused property damage. Plaintiffs would find an affirmative answer in the tort of "negligent interference with prospective economic advantage" described in J'Aire Corp. v. Gregory (1979) 24 Cal.3d 799, 804-805, 157 Cal.Rptr. 407, 598 P.2d 60. Applying settled law limiting the recovery of economic losses in tort actions (Seely v. White Motor Co. (1965) 63 Cal.2d 9, 18, 45 Cal.Rptr. 17, 403 P.2d 145), we answer the question in the negative and, thus, affirm the decision of the Court of Appeal.

I. Background
This matter comes to us on review of consolidated writ proceedings affecting two cases in the superior court. Plaintiffs in Aas et al. v. William Lyon Company et al. (Super.Ct. San Diego County, 1996, No. 695611) (Aas own the single-family homes in the Belle Fleur subdivision. Plaintiff in Provencal Community Association v. William Lyon Company et al. (Super.Ct. San Diego County, 1996, No. 694688) (Provencal) is the homeowners association *722 responsible for managing and maintaining the Provencal condominium project. Defendants (as relevant here) include the William Lyon Company and Lyon Communities, Inc. (collectively Lyon), which served as developer and general contractor of Belle Fleur and Provencal, and the many subcontractors who participated in those projects.
Plaintiffs in each case allege their dwellings suffer from a variety of construction defects affecting virtually all components and aspects of construction. Based on these defects, plaintiffs assert causes of action for negligence, strict liability, breach of implied warranty and, in the Aas case alone, breach of contract and express warranty. Plaintiffs in both cases seek, among other things, the cost of repairing the alleged defects. Additionally, plaintiffs in Aas expressly seek damages representing the diminution in Value of their residences.
Trial has not yet commenced. In pretrial proceedings, defendants in both cases moved for orders in limine excluding evidence of those alleged construction defects that have not caused property damage. (There is no claim of personal injury.) Plaintiff in Provencal responded with an offer of proof asserting that some of the alleged defects violate provisions of the applicable building codes intended to prevent harm to life, health and property.[1] Plaintiff acknowledged, however, that many of the defects enumerated in defendants' motions have not actually caused property damage. The same is true in Aas. After extensive oral argument in each case, the trial court granted defendants' motions as to plaintiffs' tort claims only.[2] With the court's encouragement, plaintiffs sought review of the rulings in limine by petition for writ of mandate. The Court of Appeal, after issuing an alternative writ, denied the petitions. We granted review of that decision.
In granting defendants' motions, the trial court did not create or adopt a definitive list of construction defects to be excluded at trial. Instead, the court simply excluded "evidence of [defects] ... that have not resulted in bodily injury or physical property damage, i.e., [defects causing only] `economic loss'...." The trial court illustrated the possible effect of its ruling with the example of "a home with no resultant damages at all, but everybody agrees that the flashing's not lapped properly under the industry standards, the [Uniform Building Code], whatever, but it hasn't resulted in any leaks; everybody agrees that the tile is overextended, that is, it doesn't have the overlap of three inches that's called for by the manufacturer; that *723 you have a nailing pattern on the shear walls which does not comply with the applicable provision in the [Uniform Building Code], but the house is still standing and hasn't started swaying...." The court and the parties seemed to recognize that further hearings (see generally Evid.Code, § 402 [procedure for determining preliminary facts]) would be necessary to determine which alleged defects would, and would not, be submitted to the trier of fact in connection with plaintiffs' tort claims.[3]
The absence of a definitive list of excluded defects is of no consequence because the issue before us is one of law. While a ruling excluding evidence is not ordinarily subject to review by writ (People v. Municipal Court (Ahnemann) (1974) 12 Cal.3d 658, 660, 117 Cal.Rptr. 20, 527 P.2d 372) and typically is reviewed for abuse of discretion on appeal (People v. Williams (1997) 16 Cal.4th 153, 197, 66 Cal.Rptr.2d 123, 940 P.2d 710), a motion to exclude all evidence on a particular claim is subject to independent review as the functional equivalent of a common law motion for judgment on the pleadings (Edwards v. Centex Real Estate Corp. (1997) 53 Cal.App.4th 15, 26-27, 61 Cal.Rptr.2d 518; Clemens v. American Warranty Corp. (1987) 193 Cal.App.3d 444, 451-52, 238 Cal.Rptr. 339; see generally 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 176, pp. 589-591) or, if decided in light of evidence produced during discovery, a motion for nonsuit (Edwards v. Centex Real Estate Corp., at p. 27, 61 Cal.Rptr.2d 518). Understood as a motion for judgment on the pleadings, the dispositive question is whether plaintiffs may state a cause of action for construction defects that have not caused property damage. (Cf. id. at p. 26, 61 Cal.Rptr.2d 518.) Understood as a motion for nonsuit, the question is whether, disregarding conflicting evidence, indulging in every legitimate inference that may be drawn from the evidence, and viewing the record in the light most favorable to plaintiffs, evidence of construction defects that have not caused property damage will support a judgment in plaintiffs' favor. (Cf. id. at pp. 27-28, 61 Cal.Rptr.2d 518; see also Casey v. Overhead Door Corp. (1999) 74 Cal.App.4th 112, 123-124, 87 Cal.Rptr.2d 603 [offer of proof may defeat nonsuit based on exclusion of evidence].) Accordingly, however we view the orders on review, the sole question before us is one of law.

II. Discussion
We turn, then, to the question at hand: May plaintiffs recover in negligence from the entities that built their homes a money judgment representing the cost to repair, or the diminished value attributable to, construction defects that have not caused property damage? Plaintiffs define construction defects as deviations from the applicable building codes or industry standards. Strict liability is not here at issue. While plaintiffs have asserted strict liability claims, they no longer argue that strict liability provides a remedy for defects that have not caused property damage. We need not address liability for construction defects that have caused property damage, if any have, because the trial court's ruling does not prevent plaintiffs from introducing evidence of such defects. Nor, finally, does the ruling prevent plaintiffs from introducing any evidence relevant to their claims for breach of contract or warranty, assuming those claims survive to trial, even if that evidence has been excluded for the purposes of plaintiffs' tort claims.
This procedural posture makes the question we address fairly narrow. The question, *724 however, is not simple, because it arises from the nebulous and troublesome margin between tort and contract law. (See generally Erlich v. Menezes (1999) 21 Cal.4th 543, 550-551, 87 Cal.Rptr.2d 886, 981 P.2d 978; Freeman & Mills, Inc. v. Belcher Oil Co. (1995) 11 Cal.4th 85, 105-107, 44 Cal.Rptr.2d 420, 900 P.2d 669 (cone. & dis. Opn. of Mosk, J.).) Speaking very generally, tort law provides a remedy for construction defects that cause property damage or personal injury. Focusing on the conduct of persons involved in the construction process, courts in this state have found such a remedy in the law of negligence.[4] Viewing the home as a product, courts have also found a tort remedy in strict products liability,[5] even when the property damage consists of harm to a sound part of the home caused by another, defective part.[6] For defective products and negligent services that have caused neither property damage nor personal injury, however, tort remedies have been uncertain. Any construction defect can diminish the value of a house. But the difference between price paid and value received, and deviations from standards of quality that have not resulted in property damage or personal injury, are primarily the domain of contract and warranty law or the law of fraud, rather than of negligence. In actions for negligence, a manufacturer's liability is limited to damages for physical injuries; no recovery is allowed for economic loss alone. (Seely v. White Motor Co., supra, 63 Cal.2d 9, 18, 45 Cal. Rptr. 17, 403 P.2d 145.) This general principle, the so-called economic loss rule, is the primary obstacle to plaintiffs' claim.[7]
Plaintiffs contend the decision in J'Aire Corp. v. Gregory, supra, 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60 (J'Aire ) overcomes this obstacle. According to plaintiffs, when the parties occupy the "special relationship" defined in J'Aire (id. at p. 804, 157 Cal.Rptr. 407, 598 P.2d 60), there is both a duty to avoid negligently *725 injuring a person's economic interests and a right to recover for such injury, even though unaccompanied by any injury to person or property. Before addressing J'Aire's significance and application to this case, we review the law to which J'Aire is said to constitute an exception.
Formerly, after a builder had completed a structure and the purchaser had accepted it, the builder was not liable to a third party for damages suffered because of the work's condition, even though the builder was negligent. (E.g., Fanjoy v. Seales (1865) 29 Cal. 243, 249-250; see also Hale v. Depaoli, supra, 33 Cal.2d 228, 230, 201 P.2d 1 [reviewing the former law].) The purchaser, of course, had remedies against the builder in contract and warranty. But injured third parties had no clear remedy until we, following the trend that began with MacPherson v. Buick Motor Co. (1916) 217 N.Y. 382, 111 N.E. 1050, qualified the general rule exonerating manufacturers from third party claims with an exception applicable whenever "`the nature of a [manufactured] thing is such that it is reasonably certain to place life and limb in peril when negligently made....'" (Kalash v. Los Angeles Ladder Co. (1934) 1 Cal.2d 229, 231-232, 34 P.2d 481, quoting MacPherson v. Buick Motor Co., supra, 111 N.E. 1050,1053.) Having already held that the manufacturers of defective ladders (Kalash v. Los Angeles Ladder Co., at pp. 231-233, 34 P.2d 481), elevators (Dahms v. General Elevator Co. (1932) 214 Cal. 733, 737-742, 7 P.2d 1013), and tires (Nebelung v. Norman (1939) 14 Cal.2d 647, 654, 96 P.2d 327) could be liable to persons not in contractual privity with them yet foreseeably injured by their products, we easily applied the same rule to someone responsible for part of a house, i.e., a defective railing (Hale v. Depaoli at pp. 230-232, 201 P.2d 1).
We first recognized a remedy in the law of negligence for construction defects causing property damage, as opposed to personal injury, in Stewart v. Cox, supra, 55 Cal.2d 857, 13 Cal.Rptr. 521, 362 P.2d 345. There, we upheld a homeowner's judgment against a subcontractor who had negligently applied concrete to the inside of a swimming pool, thereby causing the release of water that damaged the pool, lot and house. In our opinion we noted, and seemingly were influenced by, the "`decisions ... plac[ing] building contractors on the same footing as sellers of goods, and ... [holding] them to the general standard of reasonable care for the protection of anyone who may foreseeably be endangered by the negligence, even after acceptance of the work.'" (Id. at p. 862, 13 Cal.Rptr. 521, 362 P.2d 345, (quoting Prosser, Torts (2d ed.1955) pp. 517-519.) The deciding factor in finding liability, however, appears to have been our own then recent decision in Biakanja v. Irving (1958) 49 Cal.2d 647, 320 P.2d 16 (Biakanja). In Biakanja, we had held that the intended beneficiary of a failed testamentary gift could recover damages from a notary public who, practicing law without a license, negligently prepared the will and failed to have it properly solemnized. Because Biakanja is the acknowledged basis for the later decision in J'Aire, supra, 24 Cal.3d 799, 804, 157 Cal.Rptr. 407, 598 P.2d 60, the case on which plaintiffs here primarily rely, it will be discussed in more detail later (101 Cal.Rptr.2d at p. 730, 12 P.3d at p. 1136, post). At this point, it suffices to note that Biakanja held that the negligent performance of a contractual obligation, resulting in damage to the property or economic interests of a person not in privity, could support recovery if the defendant was under a duty to protect those interests. (Biakanja, at pp. 648-650, 320 P.2d 16.) "The determination whether in a specific case the defendant will be held liable to a third person not in privity," we wrote, "is a matter of policy and involves the balancing of various factors...." (Id. at p. 650, 320 P.2d 16.)[8] *726 Applying those factors to the negligent concrete subcontractor in Stewart v. Cox, supra, 55 Cal.2d 857, 13 Cal.Rptr. 521, 362 P.2d 345), we determined that he should not be exempted from liability proximately caused by his negligence. His work, we explained, was specifically intended to affect the plaintiffs; damage to their property was foreseeable if the work were negligently done; and serious damage actually occurred. (Id at p. 863, 13 Cal.Rptr. 521, 362 P.2d 345.)
Two years later, we again applied Biakanja, supra, 49 Cal.2d 647, 320 P.2d 16, to uphold a judgment for property damage caused by negligent residential construction. (Sabella v. Wisler, supra, 59 Cal.2d 21, 29, 27 Cal.Rptr. 689, 377 P.2d 889 (Sabella).) The defendant had built a house and offered it for sale to the general public. As it turned out, the defendant's negligent preparation of the lot, in combination with a subcontractor's careless plumbing work, later caused leaks, subsidence and damage to the house. The purchasers sued for negligence. The builder, arguing against the imposition of tort liability, sought to distinguish the recent decision in Stewart v. Cox, supra, 55 Cal.2d 857, 13 Cal.Rptr. 521, 362 P.2d 345 (Stewart), on the ground "that damage to property other than the swimming pool [in Stewart] was foreseeable, [whereas] ... the only harm foreseeable [in Sabella] ... was damage to the house itself." (Sabella, at p. 29, 27 Cal.Rptr. 689, 377 P.2d 889.) We rejected the asserted distinction because we had already determined "in the Stewart case that the liability of a contractor should be determined by the consideration and weighing of the various factors bearing upon liability [i.e., the factors set out in Biakanja at page 650, 320 P.2d 16], rather than by resort to special rules or distinctions." (Sabella, at pt 29, 27 Cal. Rptr. 689, 377 P.2d 889.)
In the years following Sabella, supra, 59 Cal.2d 21, 27 Cal.Rptr. 689, 377 P.2d 889, the law governing tort remedies for construction defects diverged into two distinct theories: (l) strict products liability; and (2) the theory of negligence outlined in Biakanja, supra, 49 Cal.2d 647, 320 P.2d 16, and further developed in J'Aire, supra, 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60.
We first embraced the doctrine of strict products liability in Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, just a week after deciding Sabella, supra, 59 Cal.2d 21, 27 Cal.Rptr. 689, 377 P.2d 889. A few years later, the court in Kriegler v. Eichler Homes, Inc., supra, 269 Cal.App.2d 224, 74 Cal.Rptr. 749 (Kriegler ), applied the new tort to mass-produced homes, reasoning that in "today's society, there are no meaningful distinctions between [the] mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same." (Id. at p. 227, 74 Cal.Rptr. 749; see also Avner v. Longridge Estates, supra, 272 Cal.App.2d 607, 609-615, 77 Cal.Rptr. 633 [examining and following Kriegler].) The relevant policy considerations, the Kriegler court explained, were the average home buyer's reliance on the builder's skill and implied representations of fitness, and the public interest in assigning the cost of foreseeable injuries to the developer who created the danger. (Kriegler, at p. 228, 74 Cal. Rptr. 749; cf. Greenman v. Yuba Power Products, Inc., at pp. 63-64, 27 Cal.Rptr. 697, 377 P.2d 897.)
While these decisions applied the doctrine of strict liability to mass-produced homes,[9] they did not create a remedy for *727 defects that have not caused property damage or personal injury. Whatever the product, whether homes or automobiles, strict liability affords a remedy only when the defective product causes property damage or personal injury. The tort does not support recovery of damages representing the lost benefit of a bargain, such as the cost of repairing a defective product or compensation for its diminished value. We explained this principle in Seely v. White Motor Co., supra, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (Seely ). "The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss," we wrote, "is not arbitrary and does not rest on the `luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products." (Id. at p. 18, 45 Cal.Rptr. 17, 403 P.2d 145.) A manufacturer "can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety," but not "for the level of performance" of its products unless the manufacturer "agrees that the product was designed to meet the consumer's demands." (Ibid.) Similarly, "[a] consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will." (Ibid.)
Applying these principles, we concluded in Seely, supra, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, that the plaintiff could not recover in strict liability or negligence for the cost of repairing a defective truck or for business income lost because the truck could not make deliveries. "Even in actions for negligence," we wrote, "a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone." (Id. at p. 18, 45 Cal.Rptr. 17, 403 P.2d 145.) Plaintiffs argue that this statement, and Seely's other observations about damages for negligence, were dictum because the court actually upheld, on a breach of express warranty theory, an award of damages representing the purchase price of the truck and lost profits. (Id. at p. 13, 45 Cal.Rptr. 17, 403 P.2d 145.) Indeed, the statement can be seen either as dictum or as part of the court's rationale for permitting the Seely plaintiff to recover his economic losses in warranty rather than in tort. Which label we attach to the statement is of no consequence. This is because the principle articulated in Seely has by critical examination and application in subsequent cases been confirmed as law. Courts routinely apply Seely in strict liability and negligence cases alike to distinguish recoverable damages for physical injury from unrecoverable damages representing the benefit of a contractual bargain.
In Zamora v. Shell Oil Co. (1997) 55 Cal.App.4th 204, 208-211, 63 Cal.Rptr.2d 762, for example, homeowners were not allowed to recover in negligence or strict liability for the cost of replacing water pipes known to be defective, but which had not yet leaked. In Fieldstone v. Briggs Plumbing Products, Inc. (1997) 54 Cal. App.4th 357, 363-367, 62 Cal.Rptr.2d 701, a strict liability general contractor was not awarded the cost of replacing installed sinks that rusted and chipped prematurely, because no other property had been damaged. In San Francisco Unified School Dist. v. W.R. Grace & Co. (1995) 37 Cal.App.4th 1318, 1327-1330, 44 Cal.Rptr.2d 305, a public school district could not state a cause of action in negligence or strict liability based on the presence of asbestos products in its buildings, when the products had not contaminated *728 the buildings by releasing friable asbestos. In Sacramento Regional Transit Dist. v. Grumman Flxible (1984) 158 Cal.App.3d 289, 293-298, 204 Cal.Rptr. 736, the court held a transportation district could not recover in negligence or strict liability for the cost of repairing defective bus parts that had not caused further damage. "We believe," the court explained, that "the line between physical injury to property and economic loss reflects the line of demarcation between tort theory and contract theory." (Id at p. 294, 204 Cal.Rptr. 736.) As one final example, significant because of its similarity to the case before us, the court in Casey v. Overhead Door Corp., supra, 74 Cal.App.4th 112, 123-124, 87 Cal.Rptr.2d 603, a negligence case based on defective windows in mass-produced housing, relied on Seely, supra, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, to uphold an order excluding testimony about damages representing the cost to replace defective windows that had not caused property damage and a nonsuit based on that order. "A consumer," the court explained, "may not recover economic loss damages against the manufacturer of a defective product in a cause of action for strict liability or negligence. (Seely supra, at p.] 18 [45 Cal.Rptr. 17, 403 P.2d 145]) [¶] Since plaintiffs could not recover economic losses [i.e., the cost of repairing and replacing the defective windows], testimony on that item of damages would have been irrelevant." (Casey v. Overhead Door Corp., at p. 123, 87 Cal.Rptr.2d 603.)
Over time, the concept of recoverable physical injury or property damage expanded to include damage to one part of a product caused by another, defective part. Examples include cases in which poorly prepared lots subsided, damaging the houses built thereon (Stearman v. Centex Homes, supra, 78 Cal.App.4th 611, 615, 616-623, 92 Cal.Rptr.2d 761), in which defective bottle caps ruined wine (International Knights of Wine, Inc. v. Ball Corp. (1980) 110 Cal.App.3d 1001, 1003-1005, 168 Cal.Rptr. 301 (lead opn. of Roth, P.J.); see also id. at p. 1008, 168 Cal.Rptr. 301 (conc. opn. of Fleming, J.)), and in which an unknown defect in an engine compartment started a fire that destroyed the entire automobile (Gherna v. Ford Motor Co. (1966) 246 Cal.App.2d 639, 644, 649-651, 55 Cal.Rptr. 94). Indeed, the decision in Seely, supra, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, suggested these results by intimating that further damage to a truck caused by a manufacturing defect might be recoverable in strict liability or negligence, even though the cost of repairing the original defect was not. (Id. at p. 19, 45 Cal. Rptr. 17, 403 P.2d 145; see generally Stearman v. Centex Homes, at pp. 616-623, 92 Cal.Rptr.2d 761 [extensively discussing the point].)
Plaintiffs argue no requirement of property damage exists, at least in the context of residential construction. The cases discussed above do not support the argument. They go only so far as to hold that property damage compensable in tort can exist when a defective component damages other parts of the same product. Plaintiffs attempt to find a more favorable rule in the two older cases noted above, Stewart, supra, 55 Cal.2d 857, 13 Cal.Rptr. 521, 362 P.2d 345, and Sabella, supra, 59 Cal.2d 21, 27 Cal.Rptr. 689, 377 P.2d 889. (See ante, 101 Cal.Rptr.2d at p. 725, 12 P.3d at p. 1131 et seq.) Those cases, however, do not establish the rule plaintiffs seek. We held in Stewart that the plaintiff homeowners could recover from a subcontractor for damages to their house and lot caused by water escaping from a negligently built swimming pool. (Stewart, at p. 860, 13 Cal.Rptr. 521, 362 P.2d 345.) No question was presented of a defect without resulting property damage. Likewise, Sabella concerned a house damaged by the subsidence of an improperly compacted lot. (Sabella, at pp. 23-27, 27 Cal.Rptr. 689, 377 P.2d 889.) Today, after Seely, supra, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, the plaintiffs in those cases would argue that defective components of the property (in Stewart the concrete in the swimming pool, and in Sabella the lot) had damaged *729 other components, including the houses. (See, e.g., Stearman v. Centex Homes, supra, 78 Cal.App.4th 611, 622-623, 92 Cal. Rptr.2d 761.) Because Stewart and Sabella clearly involved property damage, we find nothing in those decisions to cast doubt on the requirement of property damage later articulated in Seely and the many cases following Seely. (See ante, 101 Cal.Rptr.2d at p. 726, 12 P.3d at p. 1132, et seq.)[10]
Plaintiffs also contend the court in Seely, supra, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, was concerned exclusively with commercial losses or lost business profits, rather than economic losses in a broader sense. To the contrary, the court in Seely was unmistakably concerned not just with lost profits but also with the fundamental difference between, on the one hand, the consumer's contractual interest in having a product of the expected, bargained-for value and quality, and, on the other hand, the consumer's tort interest in not suffering property damage or personal injury due to negligence in the manufacturing process. Chief Justice Traynor could not have articulated the point more clearly: "A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone." (Id at p. 18, 45 Cal.Rptr. 17, 403 P.2d 145.) Certainly the opinion also speaks of the manufacturer not being "held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands." (Ibid., italics added.) After all, the immediate factual context of the case before the court included a claim for lost profits. (Id at p. 13, 45 Cal.Rptr. 17, 403 P.2d 145.) But to read this court's seminal decision in Seely as speaking only to claims for lost profits, and not more generally to the distinction between tort and contract, is to mistake the particular application for the governing principle.
An uncertain number of plaintiffs purchased their houses directly from defendant Lyon. As to these plaintiffs, it is argued, privity of contract offers an additional reason for rejecting any requirement of property damage in an action for negligence based on construction defects. It has been said that "[a] contract to perform services gives rise to a duty of care which requires that such services be performed in a competent and reasonable manner" and that "[a] negligent failure to do so may be both a breach of contract and a tort." (North American Chemical Co. v. Superior Court (1997) 59 Cal.App.4th 764, 774, 69 Cal.Rptr.2d 466.) Therefore, plaintiffs argue, defendant Lyon's negligent breach of contractual duties owed directly to plaintiffs to deliver homes in compliance with the applicable building codes is a tort, for which plaintiffs may recover "the amount which will compensate for all the detriment proximately caused thereby...." (Civ.Code, § 3333.)
The argument is not persuasive. A person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations. Instead, "`[c]ourts will generally enforce the breach of a contractual promise through contract *730 law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.'" (Erlich v. Menezes, supra, 21 Cal.4th 543, 552, 87 Cal.Rptr.2d 886, 981 P.2d 978, quoting Freeman & Mills, Inc. v. Belcher Oil Co., supra, 11 Cal.4th 85, 107, 44 Cal. Rptr.2d 420, 900 P.2d 669 (cone. & dis. opn. of Mosk, J.).) This court recently rejected the argument that the negligent performance of a construction contract, without more, justifies an award of tort damages. (Erlich v. Menezes at pp. 550-554, 87 Cal.Rptr.2d 886, 981 P.2d 978 [reversing an award of damages for emotional distress for negligent construction].) In so doing, however, we reiterated that conduct amounting to a breach of contract becomes tortious when it also violates a duty independent of the contract arising from principles of tort law. (Id. at p. 551, 87 Cal. Rptr.2d 886, 981 P.2d 978.) The strict liability and negligence cases discussed above, which hold the builders of homes liable for construction defects causing property damage, may be understood as recognizing such an independent duty. But that duty is limited by the rule in Seely, supra, 63 Cal.2d 9, 18, 45 Cal.Rptr. 17, 403 P.2d 145, which bars recovery of economic damages representing the lost benefit of a bargain.
We noted earlier that the law of construction defects after Sabella, supra, 59 Cal.2d 21, 27 Cal.Rptr. 689, 377 P.2d 889, diverged into two theories: strict products liability, which we have discussed, and the tort recognized in J'Aire, supra, 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60. Apart from the arguments that Seely, supra, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, does not apply to negligent construction (see ante, 101 Cal.Rptr.2d at pp. 728-729, 12 P.3d at pp. 1134-1135) and that plaintiffs in privity may recover tort damages for breach of contract (see ante, at p. 729, 12 P.3d at p. 1135), plaintiffs base their claim exclusively on J'Aire and cases following that decision.
J'Aire, supra, 24 Cal.3d 799, 157 Cal. Rptr, 407, 598 P.2d 60, as mentioned, relied on this court's 1958 decision in Biakanja, supra, 49 Cal.2d 647, 320 P.2d 16. In Biakanja, we held that a defendant's negligent performance of a contractual obligation resulting in damage to the property or economic interests of a person not in privity could support recovery if the defendant was under a duty to protect those interests. The court articulated a case-by-case test for identifying such a duty. "The determination whether in a specific case the defendant will be held liable to a third person not in privity," we wrote, "is a matter of policy and involves the balancing of various factors...." (Biakanja, at p. 650, 320 P.2d 16.) The six factors were: "[1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." (Ibid.) In concluding the defendant notary owed a duty to an intended beneficiary not to mishandle the will's drafting and solemnization, we attached particular importance to the fact that the "`end and aim'" of the notary's service to the testator was "to provide for the passing of [the] estate to [the] plaintiff (ibid.), and to the high impropriety of, and need to prevent, the unlicensed practice of law (id. at p. 651, 320 P.2d 16).
Twenty-one years later, the court in J'Aire, supra, 24 Cal.3d 799, 157 Cal. Rptr. 407, 598 P.2d 60, applied the Biakanja (supra, 49 Cal.2d 647, 650, 320 P.2d 16) factors to conclude that the tenant of a building used as a restaurant could state a cause of action for negligence against a renovation contractor hired by the building's owner for business income lost when the contractor "fail[ed] to complete the project with due diligence." (J'Aire, at pp. 802, 804-805, 157 Cal.Rptr. *731 407, 598 P.2d 60.) Applying the Biakanja factors, the court held that a "special relationship" (J'Aire, at p. 804, 157 Cal. Rptr. 407, 598 P.2d 60) permitting recovery of economic losses (i.e., the relationship defined by the Biakanja test) existed between the contractor and the tenant. The court dismissed concerns that such a theory of recovery would threaten liability, out of proportion to fault, for remote consequences and speculative damages. (J'Aire, at pp. 807-808, 157 Cal.Rptr. 407, 598 P.2d 60.) In the court's view, the Biakanja factors, in combination with "ordinary principles of tort law such as proximate cause," were "fully adequate to limit recovery" of purely economic damages "without the drastic consequence of an absolute rule which bars recovery in all such cases." (J'Aire, at p. 808, 157 Cal. Rptr. 407, 598 P.2d 60.)
The lower courts have applied the theory of liability articulated in J'Aire, supra, 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60, in a wide variety of cases. To mention just a few, courts have relied on J'Aire to assess a chemical manufacturer's claim against a transportation company for business losses caused by the contamination of its product in shipment (North American Chemical Co. v. Superior Court, supra, 59 Cal.App.4th 764, 781-785, 69 Cal.Rptr.2d 466); a dairy's claim against the manufacturer of an allegedly defective milking machine for lost profits and property damage (Ott v. Alfa-Laval Agri, Inc. (1995) 31 Cal.App.4th 1439, 1448-1457, 37 Cal. Rptr.2d 790); a construction lender/mortgagee's claim against a builder for construction defects (Sumitomo Bank v. Taurus Developers, Inc., supra, 185 Cal. App.3d 211, 223-226, 229 Cal.Rptr. 719); an abalone packer's claim for lost profits against the manufacturer of unusable cans (Ales-Peratis Foods Internat, Inc. v. American Can Co. (1985) 164 Cal.App.3d 277, 284-290, 209 Cal.Rptr. 917); and real estate investors' claims for the cost of repairing construction defects in an apartment building (Huang v. Garner, supra, 157 Cal.App.3d 404, 422-425, 203 Cal.Rptr. 800; see post, 101 Cal.Rptr.2d at p. 734, 12 P.3d at p. 1139 et seq.).
The lower courts have also expanded upon J'Aire, supra, 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60. While the court in J'Aire purported only to address duties owed to persons not in contractual privity with the defendant (id. at p. 804, 157 Cal.Rptr. 407, 598 P.2d 60), courts subsequently have applied J'Aire to cases in which privity did exist. These courts have concluded that "the reasoning of J'Aire is wholly incompatible with a limitation of the cause of action to those instances in which the plaintiff and defendant are not in privity...." (Ott v. Alfa-Laval Agri, Inc., supra, 31 Cal.App.4th 1439, 1448, 37 Cal.Rptr.2d 790; see also North American Chemical Co. v. Superior Court, supra, 59 Cal.App.4th 764, 783, 69 Cal. Rptr.2d 466; Pisano v. American Leasing (1983) 146 Cal.App.3d 194, 197, 194 Cal. Rptr. 77 [both applying J'Aire in cases apparently involving privity].)
Plaintiffs contend that J'Aire, supra, 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60, when it applies, displaces the general rule (Seely, supra, 63 Cal.2d 9, 18, 45 Cal.Rptr. 17, 403 P.2d 145) that damages are not recoverable for product defects that have not caused property damage.[11] Plaintiffs base the contention on the following statement in J'Aire: "Where the risk of harm is foreseeable, ... an injury to the plaintiffs *732 economic interests should not go uncompensated merely because it was unaccompanied by any injury to his person or property." (J'Aire, at p. 805, 157 Cal. Rptr. 407, 598 P.2d 60.) The validity of the orders on review depends largely on the significance of that statement. Paraphrasing it, one might ask the dispositive question this way: Does the law of negligence protect plaintiffs' economic interests in having houses that fully comply with the building codes, measured by the cost of repairs or diminished value associated with noncompliance, even though the asserted harm to those interests is unaccompanied by any injury to person or property?
To apply the multifactored balancing test set out in J'Aire, supra, 24 Cal.3d 799, 804, 157 Cal.Rptr. 407, 598 P.2d 60, tends to involve a court in making fairly subjective judgments. In this case, however, a relatively objective obstacle to plaintiffs' claim appears in factor (3), which looks to "the degree of certainty that the plaintiff suffered injury...." (Ibid.) Construction defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses, do not comfortably fit the definition of "`appreciable harm'"an essential element of a negligence claim. (Dairies v. Krasna (1975) 14 Cal.3d 502, 513, 121 Cal.Rptr. 705, 535 P.2d 1161; see San Francisco Unified School Dist. v. W.R. Grace & Co., supra, 37 Cal.App.4th 1318, 1327-1331, 44 Cal. Rptr.2d 305 [the presence of asbestos products in buildings did not, prior to the release of friable asbestos, constitute actual and appreciable harm under Davies v. Krasna]; Zamora v. Shell Oil Co., supra, 55 Cal.App.4th 204, 208-211, 63 Cal. Rptr.2d 762 [finding no cognizable damage in the cost of replacing defective pipes that had not yet leaked].) The breach of a duty causing only speculative harm or the threat of future harm does not normally suffice to create a cause of action. (Davies v. Krasna, at p. 513, 121 Cal.Rptr. 705, 535 P.2d 1161.) For the same reasonbecause the physical harm traditionally compensable in tort is lackingto ask in the words of factor (2) whether the harm to plaintiffs was "foreseeable]" (J'Aire, at p. 804, 157 Cal.Rptr. 407, 598 P.2d 60) simply begs the question: What harm?
Plaintiffs argue that the cost of repairs is an accepted measure of damage for construction defects and that plaintiffs could make the cost of repairs certain within the meaning of J'Aire, supra, 24 Cal.3d 799, 804, 157 Cal.Rptr. 407, 598 P.2d 60, by voluntarily repairing defects and obtaining a receipt for money spent. This confuses the measurement of alleged damages with the ability of particular facts to support a tort action. To say that one's house needs repairs costing a certain amount is not necessarily to say that one has suffered the type of harm cognizable in tort, as opposed to contract. Plaintiffs also argue that "the degree of certainty that the plaintiff suffered injury" (ibid.) is merely a factor to be balanced with the other factors set out in J'Aire for determining a person's liability for negligently injuring another's economic interests. We do not believe, however, that the J'Aire court intended to dispense with the rule that appreciable, nonspeculative, present injury is an essential element of a tort cause of action. (Davies v. Krasna, supra, 14 Cal.3d 502, 513, 121 Cal.Rptr. 705, 535 P.2d 1161; cf. Romano v. Rockwell Internal, Inc. (1996) 14 Cal.4th 479, 500-503, 59 Cal.Rptr.2d 20, 926 P.2d 1114 [plaintiff suffered appreciable harm sufficient to support a tort claim for wrongful discharge upon actual termination rather than upon prospective notification].) Lacking that fundamental prerequisite to a tort claim, it is difficult to imagine what other factors, singly or in combination, might justify the court in finding liability.
Turning to the other factors, we find no adequate justification. We may assume for argument's sake that the conduct of a person engaged in construction is "intended to affect" all foreseeable purchasers of the property. (J'Aire, supra, 24 Cal.3d 799, 804, 157 Cal.Rptr. 407, 598 P.2d 60 *733 [factor (1)]; see also Sumitomo Bank v. Taurus Developers, Inc., supra, 185 Cal. App.3d 211, 224, 229 Cal.Rptr. 719; Huang v. Garner, supra, 157 Cal.App.3d 404, 423-424, 203 Cal.Rptr. 800; Cooper v. Jevne, supra, 56 Cal.App.3d 860, 869, 128 Cal.Rptr. 724.) We may also assume that a sufficiently "close[ ] connection [exists] between ... defendant's conduct" and the alleged defects. (J'Aire, at p. 804, 157 Cal.Rptr. 407, 598 P.2d 60 [factor (4)].) Also, while some "moral blame" arguably "attach[es]" to many deviations from the building codes (ibid, [factor (5)]), the degree of blame would appear to depend upon the nature of the deviation. Thus, even if significant moral blame inheres in negligent construction creating a risk of likely structural failure leading to a notice of abatement (Huang v. Garner, at p. 424 & fn. 13, 203 Cal.Rptr. 800), we may still reasonably assign reduced moral blame to less serious defects not presenting that degree of risk, and to such flaws as doors that are out of plumb, discolored drain stoppers, and inoperable garbage disposals, to take a few examples from this case. Factor (6), the last factor, looks to "the policy of preventing future harm." (J'Aire, at p. 804, 157 Cal.Rptr. 407, 598 P.2d 60.) Certainly, as plaintiff in Provencal noted in its offer of proof, the express purpose of the building codes is to "provide minimum standards to safeguard life or limb, health, property and public welfare...." (U. Bldg.Code, § 102, Cal.Code Regs., tit, 24, former § 2-102.) Plaintiffs have not shown, however, that any of the alleged defects actually poses a serious risk of harm to person or property. To say, as plaintiffs do, that the purpose, of construction standards for shear walls is to "minimize property damage and personal injury in the event of seismic and wind forces," is not to say that any given defect is sufficiently grave to pose a realistic risk of structural failure. In conclusion, applying the J'Aire factors, we do not find they justify a broad rule permitting recovery of repair costs unaccompanied by property damage or personal injury.
Plaintiffs contend precedent requires a different result. "[E]very reported decision applying the J'Aire[, supra, 24 Cal.3d 799, 804, 157 Cal.Rptr. 407, 598 P.2d 60] factors to residential construction," they argue, "has allowed the recovery of economic loss," meaning, in this context, the cost of repairing defects that have not caused property damage. The decisions plaintiffs cite, however, do not strongly support their position. The courts in Sumitomo Bank v. Taurus Developers, Inc., supra, 185 Cal.App.3d 211, 229 Cal. Rptr. 719, and Cooper v. Jevne, supra, 56 Cal.App.3d 860, 128 Cal.Rptr. 724 (which predated J'Aire and relied on Biakanja, supra, 49 Cal.2d 647, 320 P.2d 16), simply held that the plaintiffs in those cases had stated causes of action and, thus, reversed judgments of dismissal entered after demurrers were erroneously sustained. The court in Sumitomo Bank v. Taurus Developers, 
Inc., did not address the distinction between economic damages and physical harm; no such issue was raised. The court in Cooper v. Jevne held that the plaintiff homeowners had stated a cause of action in negligence against the architects of their houses, with whom the plaintiffs were not in privity. As damages for their negligence cause of action, the plaintiffs sought the cost of repairs, compensation for lost use and income, and "[p]ast and future damage to personal property," among other things. (Cooper v. Jevne, supra, 56 Cal.App.3d at p. 867, fn. 2, 128 Cal.Rptr. 724.) That the plaintiffs had stated a cause of action was established by the architects' concession that their professional liability to the plaintiffs not in privity of contract with them extended to property damage. (Id. at p. 868, fn. 3, 128 Cal.Rptr. 724.) For this reason, and because the question was not before the court on demurrer, the court's conclusion that Seely's economic loss rule does not apply to professional negligence claims (Cooper v. Jevne, at p. 869, 128 Cal.Rptr. 724) is dictum. The court, in any event, acknowledged Seely's continuing relevance *734 to the liability of a manufacturer for product defects. (Cooper v. Jevne, at p. 868, 128 Cal.Rptr. 724.) Furthermore, unlike the judgments of dismissal on appeal in Sumitomo Bank v. Taurus Developers, Inc., and Cooper v. Jevne, the instant rulings in limine do not preclude plaintiffs from presenting to the trier of fact whatever claims for property damage may exist.[12]
Plaintiffs place particular emphasis on Huang v. Garner, supra, 157 Cal.App.3d 404, 203 Cal.Rptr. 800 (Huang). The court in that case relied on J'Aire, supra, 24 Cal.3d 799, 157'Cal.Rptr. 407, 598 P.2d 60, to reverse a nonsuit for the defendants (a developer and a contractor) on the plaintiff real estate investors' claims for the cost of repairing defects in an apartment building. Some of the alleged defects had caused property damage, and some had not. (Huang, at pp. 419-425, 203 Cal.Rptr. 800.) The Huang court found the "certainty" of injury required by J'Aire (at p. 804, 157 Cal.Rptr. 407, 598 P.2d 60) in plaintiffs' duty to comply with a notice of abatement citing likely structural failure and requiring specific repairs. (Huang, at p. 424 & fn. 13, 203 Cal.Rptr. 800.) Yet Huang's analysis is not entirely satisfactory because other alleged construction defects in that case had neither caused property damage nor been cited in the notice of abatement. (Compare id. at pp. 419-420, 203 Cal.Rptr. 800 [summary of alleged defects] with id. at p. 424, fn. 13, 203 Cal.Rptr. 800 [order of abatement].) Even accepting for the sake of argument the Huang court's suggestion that a notice of abatement might suffice to convert repair costs into tort damages, the decision offers no adequate explanation for permitting the plaintiffs, consistently with Seely, supra, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, to recover repair costs for the other defects that had neither appeared in the notice nor resulted in property damage. Accordingly, we disapprove Huang to the extent it is inconsistent with the views set out in this opinion.
Whether viewed as part of the test set out in J'Aire, supra, 24 Cal.3d 799, 804, 157 Cal.Rptr. 407, 598 P.2d 60, or as an independent argument for extending tort liability, the "policy of preventing future harm" (ibid, [factor (6)]) is probably plaintiffs' strongest argument. In some sense, *735 that policy might be served by a rule of tort liability making builders, in effect, the insurers of building code compliance, even as to defects that have not caused property damage or personal injury. Moreover, as plaintiffs argue, to require builders to pay to correct defects as soon as they are detected rather than after property damage or personal injury has occurred might be less expensive. On the other hand, such a rule would likely increase the cost of housing by an unforeseeable amount as builders raised prices to cover the increased risk of liability. Such a rule should also be unnecessary to the extent buyers timely enforce their contract, warranty and inspection rights, and to the extent building authorities vigorously enforce the applicable codes for new construction.
The Chief Justice, in his concurring and dissenting opinion, proposes to resolve these conflicting policy considerations with a complex new rule of tort liability (1) barring recovery for minor defects and building code violations that have not caused personal injury or property damage; (2) permitting recovery for serious defects and code violations posing a significant risk of death, personal injury, or considerable property damage; and (3) requiring court-supervised disbursement of all damages awarded to ensure that repairs are actually made. (Cone. & dis. opn. of George, C.J., post, 101 Cal.Rptr.2d at pp. 738, 751, 752, 12 P.3d at pp. 1143, 1154, 1155.)
The proposal entails serious difficulties. First among these is that the Chief Justice, while asserting that our holding "offends ... established common law" (cone. & dis. opn. of George, C.J., post, 101 Cal. Rptr.2d at p. 738, 12 P.3d at p. 1143), nevertheless "agree[s] with the majority to the extent it declines to allow recovery in [negligence for the cost of repairing construction defects that pose no significant risk of serious personal injury or property damage" (id. at p. 752, 12 P.3d at p. 1155). As we have explained, whether the economic loss rule applies depends on whether property damage has occurred rather than on the possible gravity of damages that have not yet occurred. While the Chief Justice rejects our understanding of the economic loss rule, his concurring and dissenting opinion offers no other rationale for denying recovery for minor defects. Although the Chief Justice advances policy considerations to justify providing recovery for serious defects, his narrow conception of the economic loss rule as applicable only to commercial losses (cone. & dis. opn. of George, C.J., post, at pp. 740-741, 12 P.3d at pp. 1145-1146; but see this opn., ante, at pp. 728-729, 12 P.3d at pp. 1134-1135) would seem to compel the court to permit recovery for minor defects, as well. In short, the proposed rule lacks coherence.
The Legislature, whose lawmaking power is not encumbered by precedent, is free to adopt a rule like that proposed in the Chief Justice's concurring and dissenting opinion. Yet even if the proposed rule could plausibly be defended as a logical development of the common law, and thus appropriate for judicial rather than legislative promulgation, the rule's shortcomings would counsel its rejection. The distinction between serious and minor defects has a superficial theoretical appeal that evaporates in practice. Amicus curiae Structural Engineers Association of California, which supports plaintiffs' position in this court, aptly demonstrates that almost any building code violation can, under the right set of assumptions and circumstances, be considered serious.[13] *736 "[T]here is no mechanism at this level to separate life safety defects from cosmetic defects," amicus curiae argues; such questions, in its view, are "better left to the trier of fact after a complete presentation of expert testimony on both sides." If experts claim to be unable before trial to rule out any building code violations as trivial, then a rule looking to the potential seriousness of possible property damage, rather than the existence of actual damage, is very likely to frustrate the pretrial disposition of claims based on trivial defects. Such a rule, by forcing judges to attempt to predict the likelihood that any given defect will cause property damage and, if so, its likely seriousness, will make it difficult for them to screen out trivial claims as a matter of law. Because, moreover, the rule invites a speculative inquiry, any pretrial dispositions based thereon are likely to be inconsistent[14] and challenged on appeal. In short, the practical effect of a rule permitting recovery for "serious" defects only, however well intentioned, would likely be to insulate from demurrer and summary judgment virtually all complaints containing allegations of building code violations.
The Chief Justice's suggestion that courts should supervise the disbursement of tort damages (cone. & dis. opn. of George, C.J., post, 101 Cal.Rptr.2d at pp. 745, 753, 12 P.3d at pp. 1149, 1156) highlights a final difficulty with the rule he proposes. Ordinarily, nothing compels a successful plaintiff to spend money recovered in construction defect litigation on repairs. Indeed, plaintiffs in Aas expressly seek in their complaint, in addition to the cost of repairs, damages representing the "diminution in value" of their residences.[15] The possibility that tort dam *737 ages will not actually be spent on repairs, defendants contend, weakens the argument that imposing liability for construction defects without resulting damage will serve the policy goal of improving the state's housing stock. The rule the Chief Justice proposes would address this concern by requiring court-supervised disbursement of all damages awarded to ensure that repairs are actually made. (Cone. & dis. opn. of George, C.J., 101 Cal.Rptr.2d at p. 753, 12 P.3d at p. 1156.) Again, while such a rule might be appropriate as legislation, to reconcile it with the traditional role of the judiciary is very difficult, indeed. While there have been exceptions, courts do not ordinarily tell successful plaintiffs how to spend their tort recoveries.[16] That judicial control over the proceeds might be necessary to render the proposed liability rule fair suggests the rule tries the limits of our power to expound the common law.
In our view, the many considerations of social policy this case implicates, rather than justifying the imposition of liability for construction defects that have not caused harm of the sort traditionally compensable in tort (Seely, supra, 63 Cal.2d 9, 18, 45 Cal.Rptr. 17, 403 P.2d 145), serve instead to emphasize that certain choices are better left to the Legislature. That body has at its disposal a wider range of options and superior access to information about the social costs and benefits of each. "Legislatures, in making such policy decisions, have the ability to gather empirical evidence, solicit the advice of experts, and hold hearings at which all interested parties may present evidence and express their views...." (Foley v. Interactive Data Corp. (1988) 47 Cal.3d 654, 694, fn. 31, 254 Cal.Rptr. 211, 765 P.2d 373; see also Moore v. Regents of University of California (1990) 51 Cal.3d 120, 147, 271 Cal.Rptr. 146, 793 P.2d 479.)[17]
Home buyers in California already enjoy protection under contract and warranty law for enforcement of builders' and sellers' obligations; under the law of negligence and strict liability for acts and omissions that cause property damage or personal injury; under the law of fraud for misrepresentations about the property's condition; and an exceptionally long 10-year statute of limitations for latent construction defects (Code Civ.Proc, § 337.15). While the Legislature may add *738 whatever additional protections it deems appropriate, the facts of this case do not present a sufficiently compelling reason to preempt the legislative process with a judicially created rule of tort liability.

III. Disposition
The judgment of the Court of Appeal is affirmed.
KENNARD, J., BAXTER, J., CHIN, J., and BROWN, J., concur.
Concurring and Dissenting Opinion by GEORGE C.J.
Other courts faced with the question we address today have asked: Why should a homeowner have to wait for a personal tragedy to occur in order to recover damages to repair known serious building code safety defects caused by negligent construction? (E.g., Council of Co-Owners v. Whiting Turner (Md.1986) 308 Md. 18, 517 A.2d 336, 345.) Perhaps because those courts have addressed the matter from such a commonsense perspective, they have reached conclusions very different from that adopted by the majority in the present case. In determining that a negligently constructed home must first collapse or be gutted by fire before a homeowner may sue in tort to collect costs necessary to repair negligently constructed shear walls or fire walls, the majority today embraces a ruling that offends both established common law and basic common sense.
In this case, we must decide whether, under California law, when a building contractor has breached its duty of care by constructing a home that violates significant building safety code provisions that are designed to protect health and safety, and the homeowner has discovered these safety code violations before a personal injury has occurred or before the home has suffered any physical property damage, the homeowner, in a negligence action, may recover those costs of repair that a reasonably prudent homeowner would incur under the circumstances, or whether the "economic loss" rule of Seely v. White Motor Co. (1965) 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (Seely)a rule designed to limit recovery of such business-related losses as lost profits or lost commercial opportunitiesbars a homeowner from recovering such repair costs in a negligence action.
I agree with the majority that many if not most of the defects listed in the underlying complaintsitems such as "discolored drain stoppers, and inoperable garbage disposals" (maj. opn., ante, 101 Cal. Rptr.2d at p. 733, 12 P.3d at p. 1138)do not pose a risk of personal injury or property damage sufficient to warrant recognition of a right to recover repair costs in negligence, and hence to this extent I concur in the judgment. At the same time, however, I conclude, consistent with California authority and with the courts of other jurisdictions, that a homeowner may maintain a cause of action in negligence to recover the costs of correcting the most significant building safety code violations conceded in this litigation (e.g., shear walls that were improperly constructed or fastened and that put the structure at risk of Collapse during high winds or an earthquake; improperly constructed fire walls that would allow a fire to spread rapidly from one part of the structure to another), but that have not yet manifested themselves in physical damage to the property or resulted in personal injury. To the extent the majority bars such recovery, I dissent. Recognizing a right to recover costs to repair the serious safety defects here at issuedefects that pose a risk of serious personal injury or considerable property damagewould not require us to break new ground; all of the established factors traditionally used to assess building defect cases militate strongly in favor of such relief. And allowing such limited recovery also best comports with rational economic policy, as well as common sense: It obviously is preferable to pay a relatively few dollars at an early date to correct a serious safety risk that may cost millions *739 or billions of dollars to redress if the inhabitants of dwellings are forced to wait for disaster to strike and for death, personal injury, or physical property damage to ensue.

I.

A.
In Connor v. Great Western Sav. & Loan Assn. (1968) 69 Cal.2d 850, 73 Cal. Rptr. 369, 447 P.2d 609 (Connor), Chief Justice Roger Traynor, upholding a negligence action by homeowners against a lending institution that had financially backed and extensively controlled a new housing development, observed that "the usual buyer of a home is ill-equipped with experience or financial means to discern ... structural defects." (Id., at p. 867, 73 Cal.Rptr. 369, 447 P.2d 609.) The Connor opinion rejected as "conjectural claims" assertions that recognizing a duty on the part of the defendant to the homeowners would "increase housing costs, drive marginal builders out of business, and decrease total housing at a time of great need" (ibid.), observing that "[i]n any event, there is no enduring social utility in fostering the construction of seriously defective homes. If reliable construction is the norm, the recognition of a duty on the part of tract financiers to home buyers should not materially increase the cost of housing or drive small builders out of business." (Id., at pp. 867-868, 73 Cal.Rptr. 369, 447 P.2d 609, fn. omitted.) Finally, the court observed in Connor that "a home is not only a major investment for the usual buyer but also the only shelter he has. Hence it becomes doubly important to protect him against structural defects that could prove beyond his capacity to remedy." (Id., at p. 867, 73 Cal.Rptr. 369, 447 P.2d 609, italics added.)
As implied in the above italicized observation, tort law offers the most effective, and often the only realistic, nonstatutory remedy for consumers in this area. Although technically available to at least some of the plaintiffs in this and similar litigation, contract or warranty claims in this setting are difficult to prove and to enforce, and our decisions have recognized that problems with privity, disclaimers inserted into contracts by developers or contractors, and notice requirements, often frustrate the ability to recover on contract or warranty theories. (See, e.g., Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 61, 27 Cal.Rptr. 697, 377 P.2d 897 [notice requirement under implied warranty is a "`booby-trap for the unwary'" and "`consumers are] seldom "steeped in the business practice which justifies the rule"'"]; Anthony v. Kelsey-Hayes Co. (1972) 25 Cal.App.3d 442, 448, 102 Cal.Rptr. 113 [lack of privity defeats implied warranty claim].) As observed in Kriegler v. Eichler Homes, Inc. (1969) 269 Cal.App.2d 224, 228, 74 Cal.Rptr. 749 (Kriegler ), because the purchaser of a "`development house'" "`has no real competency to inspect on his own, his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaningful protective changes in the conveyancing documents prepared by the builder vendor is negligible....' [¶] `Buyers of mass produced development homes are not on an equal footing with the builder vendors and are no more able to protect themselves in the deed than are automobile purchasers in a position to protect themselves in the bill of sale.'" Accordingly, as Chief Justice Traynor recognized in Connor, supra, 69 Cal.2d 850, 73 Cal.Rptr. 369, 447 P.2d 609, the inadequacy of contract and warranty law properly should inform our consideration of the role and use of tort law in this context. (Cf. Kaiser Steel Corp. v. Westinghouse Elec. Corp. (1976) 55 Cal.App.3d 737, 747-748, 127 Cal.Rptr. 838.)

B.
As the majority observes, the author of Connor's rousing confirmation of the right of homeowners to sue in negligence in *740 order to remedy negligent construction also authored the majority opinion in Seely, supra, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145a decision that concerned not an action in negligence for repair of serious construction defects in residential housing, but, instead, an action under warranty and strict products liability for lost business profits arising from an assertedly defective commercial truck. The majority asserts that dictum in Seely, to the effect that "[e]ven in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone" (id., at p. 18, 45 Cal.Rptr. 17, 403 P.2d 145, italics added), supports a conclusion that there can be no recovery in negligence for any of the repair or correction costs here at issue. I disagree with the majority's broad reading of the Seely dictum, and I agree with plaintiffs that Seely's dictum should not be extended to bar recovery in negligence for costs to correct serious safety violations in the construction of dwellings that pose a significant risk of personal injury or property damage. Because the majority relies heavily upon a broad reading of Seely's dictum, and because I believe that reliance is misplaced, I review the decision in Seely in some detail.
In Seely, supra, 63 Cal.2d 9, 45 Cal. Rptr. 17, 403 P.2d 145, the plaintiff sued the manufacturer in both warranty and strict liability after his truck, which he used in his commercial hauling business, was involved in an accident and needed to be repaired. Previously, the plaintiff had become dissatisfied with the truck; he informed the manufacturer that it was "galloping" (bouncing violently) and was difficult to handle. (Id., at p. 12, 45 Cal.Rptr. 17, 403 P.2d 145.) He used the truck in his business for approximately 11 months, during which time the manufacturer tried unsuccessfully on many occasions to correct the galloping problem to the plaintiffs satisfaction. During this period, the plaintiff paid off approximately half of the purchase price. Then one day, rounding a corner, the brakes failed and the truck overturned. The plaintiff was convinced that the accident was caused by the defective condition of the truck, and he also was dissatisfied with the overall performance of the truck, even before the accident. He had the truck repaired, ceased making payments, and sued for "(1) damages, related to the accident, for the repair of the truck, and (2) damages, unrelated to the accident, for the money he had paid on the purchase price and for the profits lost in his business because he was unable to make normal use of the truck." (Id., at p. 13, 45 Cal.Rptr. 17, 403 P.2d 145.) The trial court found that the plaintiff had not proved that the galloping had caused the accident, and hence declined to award damages for repair costs. (Ibid.) The trial court did, however, award the other damages on the plaintiffs warranty cause of action. (Ibid.)
In Seely, supra, 63 Cal.2d 9, 45 Cal. Rptr. 17, 403 P.2d 145, this court approved the award of those damages, based upon the plaintiffs warranty theory. Then, in dictum, we also addressed the plaintiffs' strict liability claim. At this point in the analysis, we considered the damages described in item (2) above, finding them not allowable under strict liability theory. First, we noted concern about the prospect of permitting "unknown and unlimited" liability for such "commercial losses." (Id, at p. 17, 45 Cal.Rptr. 17, 403 P.2d 145.) In this regard, we stated that a consumer (i.e., the plaintiff) is "fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will.", (Id., at p. 18, 45 Cal.Rptr. 17, 403 P.2d 145.) The court then stated, in dictum within dictum that has been repeated in subsequent cases and is heavily relied upon by the majority: "Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone." (Ibid., italics added.)
*741 Clearly, this dictum in Seely, supra, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, was directed toward the issue presented in Seelythe recovery of lost profits and related liability for commercial expectation damages. The majority, however, reads Seely's dictum much more broadly, as precluding recovery in either negligence or strict liability for the cost of repairing serious and potentially life-threatening defects reflecting building safety code violations in residential housing. I find no such suggestion in Seely. Although the court felt it important to explain that a manufacturer should not be liable in tort for commercial losses caused by the failure of a product to meet the specific needs of a purchaser's business (id., at p. 17, 45 Cal. Rptr. 17, 403 P.2d 145), it did not assert, expressly or by implication, that there could be no damages in negligence for correction of serious safety violations in residential housing that pose a danger of personal injury or serious property damage. Such a conclusion, of course, would be quite at odds with the tenor of Chief Justice Traynor's above quoted observations in Connor, supra, 69 Cal.2d at pages 867-868, 73 Cal.Rptr. 369, 447 P.2d 609, rendered just a few years thereafter.
Recognition of a homeowner's ability to recover repair costs necessary to remedy serious safety defects in residential housing would not substantially implicate Seely's concerns about "unknown and unlimited" liability for "commercial losses." (Seely, supra, 63 Cal.2d at p. 17, 45 Cal. Rptr. 17, 403 P.2d 145.) As plaintiffs note in their joint opening brief, "[r]ecovery of costs of repair in negligence is adequately limited. Code violations or other negligent construction must be proven. Causation must be proven. Costs of repair are limited in amount, even if expert opinions may vary as to exact amounts. The number of claimants is limited to the number of homes sold. These factors distinguish recovery of such costs from the `economic loss' cases in which concern was expressed about potentially limitless claims by potentially limitless claimants."
In short, Seely's cautions against allowing recovery of commercial expectation damages for lost profits do not justify barring recovery of the cost of repairing serious construction defects involving dwelling code violations that pose a threat to life and property. Accordingly, I find the majority unpersuasive to the extent that it relies on a broad interpretation of the Seely dictum.

C.
The understanding of the limited reach of Seely, supra, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, set forth above is confirmed by numerous decisions described below, in which California courts repeatedly have allowed recovery of construction repair costs.
Eleven years after Seely, the Court of Appeal in Cooper v. Jevne (1976) 56 Cal. App.3d 860, 128 Cal.Rptr. 724 (Cooper), allowed a negligence suit by condominium owners against architects, for "economic loss" damages (id., at p. 868, 128 Cal.Rptr. 724) that included "cost of repairs" (id., at p. 867, fn. 2, 128 Cal.Rptr. 724). Eight years later, the Court of Appeal decision in Huang v. Garner (1984) 157 Cal.App.3d 404, 203 Cal.Rptr. 800 (Huang), presented a situation essentially identical to the one that we address in this case. Apartment building owners sued the developer and contractor for costs to remedy serious safety code violations that, like the present case, fell into two categories: (i) building safety code violations that had manifested themselves in physical damage (id., at p. 419, 203 Cal.Rptr. 800 [these consisted of "deflected and cracked beams and dry rot damages to the balcony area"] ), and (ii) building safety code violations that had not yet manifested themselves in physical damage (id., at pp. 419-420, 203 Cal.Rptr. 800 [in Huang, as here, these consisted of inadequate or missing "firewalls, shear walls, fire stops, and other alleged defects in the structure which had not yet caused actual physical damages at the time of *742 trial"]). The Court of Appeal in Huang, distinguishing Seely, ruled that the apartment owners could recover repair costs to remedy the serious building safety code violations that had not yet manifested themselves in physical damage. (Id., at pp. 421-425, 203 Cal.Rptr. 800.) Addressing the crucial question whether there was sufficient certainty that the plaintiffs in that case had suffered harm, the court noted in Huang that the defects were "dangerous, despite the fact that for approximately 17 years they have not caused personal injury to any tenant." (Id., at p. 424, 203 Cal.Rptr. 800.) That court further observed: "Failure to comply with the Uniform Building Code by a developer-contractor involves potential risk of harm to later purchasers. In this case ample evidence was offered with respect to the cost of repairing the subject defects. Thus it is relatively certain that plaintiffs have suffered injury as a result of the defects.... [P]laintiffs have ... suffered damages in being forced to repair the building." (Ibid.)
In Sumitomo Bank v. Taurus Developers, Inc. (1986) 185 Cal.App.3d 211, 229 Cal.Rptr. 719, a California appellate court followed Huang, supra, 157 Cal.App.3d 404, 203 Cal.Rptr. 800, and Cooper, supra, 56 Cal.App.3d 860, 128 Cal.Rptr. 724, allowing a purchaser of a condominium complex to pursue a negligence action against the builder for the cost to repair both then existing physical damage, e.g., cracking concrete and leaking roofs, and, apparently, detriment that had not yet manifested itself in physical damage, e.g., improperly designed drainage and structural retaining walls. (185 Cal.App.3d at pp. 216, 223-226, 229 Cal.Rptr. 719.) Subsequently, construction litigation decisions of our Courts of Appeal that have had occasion to address the aspect of Huang that is relevant here have uniformly treated Huang's analysis as accepted and established law. (See, e.g., Keru Investments, Inc. v. Cube Co. (1998) 63 Cal.App.4th 1412, 1421-1422, 74 Cal.Rptr.2d 744 [noting that in Huang the plaintiffs were not seeking lost opportunity costs, but instead, "`the cost to repair the defects in the structure in order to bring it into compliance with the Uniform Building Code'"]; Krusi v. S.J. Amoroso Construction Co. (2000) 81 Cal.App.4th 995, 1000-1001, 97 Cal.Rptr.2d 294 [describing with apparent approval Huang's conclusion that "the plaintiffs were entitled to economic damages" in order to correct building code violations "in addition to recovery for physical damage" and noting testimony in Huang that the defects were "`dangerous, despite the fact that for approximately 17 years they have not caused personal injury to any tenant'"]; cf. Stearman v. Centex Homes (2000) 78 Cal.App.4th 611, 618, 92 Cal.Rptr.2d 761 [discussing with approval Huang's definition and application of [Seely's] economic loss rule"].)

D.
Finally, the above reading of Seely, supra, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, also is confirmed by numerous cases from other jurisdictions that permit recovery of construction repair costs essentially identical to those here at issue. Although the majority adopts a broad view of the Seely dictum as barring recovery of costs for repair of construction defects that pose a substantial risk to persons and property, the trend of well-reasoned sister-court decisions is in the opposite direction.
Almost all of the out-of-state decisions in this area cite and discuss Seely and adopt in general a version of the rule set out in that case, restricting recovery for commercial expectation damages. These sisterstate decisions recognize that Seely was concerned primarily with precluding potentially limitless damages for lost profits and/or lost commercial expectations in the context of suits for product liability, and these out-of-state cases also recognize, explicitly or implicitly, that suits for costs to repair and correct dwelling safety defects that pose a serious risk to life and limb are *743 clearly distinguishable from Seely and do not similarly implicate concerns of limitless damages.
The majority, ante, 101 Cal.Rptr.2d at page 724, footnote 7, 12 P.3d at page 1131, footnote 7, mentions three such out-of-state decisions. (Kennedy v. Columbia Lumber & Mfg. Co. (1989) 299 S.C. 335, 384 S.E.2d 730, 737 [a builder does not escape liability for building code violations merely because "luck has smiled upon him and no physical harm has yet occurred.... [W]e once again join those states which strive to protect the modern new home buyer"]; Oates v. Jag, Inc. (1985) 314 N.C. 276, 333 S.E.2d 222, 225-226 [allowing recovery of repair costs to correct building code violations that had apparently not caused physical damages, and noting, "[w]e must be realistic... The purchaser can ill afford to suddenly find a latent defect in his or her home ... and have no remedy for recourse"]; Council of Co-Owners v. Whiting-Turner, supra, 308 Md. 18, 517 A.2d 336 (Whiting-Turner).)
The Whiting-Turner case is especially well reasoned and particularly apt here. In that case the Maryland high court permitted the plaintiff in a negligence action to recover the costs necessary to correct the construction of 10 vertical utility shafts in a 22-story condominium complex. The shafts presented a fire hazard because of the absence of required insulationa serious violation of applicable building codes. (Whiting-Turner, supra, 517 A.2d at pp. 338-339.) Although the defective shafts all posed a clear danger of death or personal injury, none of them yet had produced any personal injury or physical property damage.
The Whiting-Turner decision held: "`We reject the contention by appellant that there can be no recovery in negligence absent proof of personal injury or property damage. We hold that there can be recovery for economic loss. Why should a buyer have to wait for a personal tragedy to occur in order to recover damages to remedy or repair defects? In the final analysis, the cost to the developer for a resulting tragedy could be far greater than the cost of remedying the condition.' [¶] We conclude that the determination of whether a duty will be imposed in this type of case should depend upon the risk generated by the negligent conduct, rather than upon the fortuitous circumstance of the nature of the resultant damage. Where the risk is of death or personal injury the action will lie for recovery of the reasonable cost of correcting the dangerous condition." (Whiting-Turner, supra, 517 A.2d at p. 345, fn. omitted.)[1]
In addition to these authorities, it is instructive to consider another out-of-state decision relied upon by defendants to support their assertion that all repair and correction costs in the present case should be barred under Seely's rule restricting recovery of commercial expectation damages. As defendants observe, the Florida Supreme Court's closely divided decision in Casa Clara v. Charley Toppino and Sons, Inc. (Fla.1993) 620 So.2d 1244 (Casa Clara) does support defendants' and the majority's position. There, a condominium association sued the supplier of concrete for having provided defective concrete with a high salt content that caused it to crack, putting at risk the dwellings constructed with the concrete. The Florida high court, employing a broad interpretation of Seely's dictum barring recovery of commercial expectation damages (Casa Clara, at p. 1245 et seq.), and ignoring Chief Justice Traynor caution against relying on contract law to protect homeowners *744 in such circumstances (see ante, 101 Cal.Rptr.2d at pp. 722-723, 12 P.3d at pp. 1128-1130), concluded that home buyers should "`bear the cost of economic losses sustained by those who failed to bargain for adequate contract remedies'" (Casa Clara, at p. 1247), and denied the condominium association any recovery in negligence premised upon "the mere possibility" that the defective concrete "will cause physical injury." (Id., at p. 1247.) The court reasoned in Casa Clara that the plaintiffs'"argument goes completely against the principle that injury must occur before a negligence action exists. Because an injury has not occurred, its extent and the identity of injured persons is completely speculative." (Ibid., italics added.) The court in Casa Clara was divided four to three, and reached its conclusion over the dissenting justices' protestations that "it stretches reason to apply the [economic loss] doctrine in this context." (Id., at p. 1248 (cone. & dis. opn. of Barkett, C.J.).)
Defendants, however, overlook the subsequent history of Casa Clara. More than a year ago, the Florida Supreme Court, by a six-to-one vote, "effectively overruled" that case. (Moransais v. Heathman (Fla. 1999) 744 So.2d 973, 985 (dis. opn. of Overton, J.) [characterizing the majority opinion] (Moransais).)[2] The Florida high court's analysis and observations in Moransais concerning the proper scope of Seely's rule barring recovery of commercial expectation damages are especially instructive and strongly repudiate the broad application of the rule proposed by defendants and the majority.
Moransais, supra, 744 So.2d 973, was a suit by a homeowner against a professional engineer who had inspected the plaintiffs home prior to purchase. The inspection had failed to disclose various (unspecified) defects that "rendered the home uninhabitable" (id., at p. 975), but which had not yet caused any property damage or personal injury. The plaintiff was not in privity with the engineer, but was with the engineer's employer. The plaintiff sued the engineer personally for his negligent inspection of the home.
Consistent with Cooper, supra, 56 Cal.App.3d 860, 128 Cal.Rptr. 724, in which our Court of Appeal permitted a similar action against architects, the Florida high court in Moransais, supra, 744 So.2d 973, allowed the negligence suit against the engineer. In the process, the Florida court explained that its prior decisionsincluding, most notably, Casa Clara "[u]nfortunately" had extended the economic loss doctrine "beyond its principled origins and have contributed to applications of the rule ... well beyond our original intent." (Moransais, supra, 744 So.2d at p. 980, italics added).) The court held that henceforth, the doctrine would be limited in order to avoid precluding traditional and well-established actions in tort. (Id., at p. 983.)
Underscoring its retreat from its prior applications of Seely's economic loss rule, the court explained in Moransais: "Today, we again emphasize that by recognizing that the economic loss rule may have some genuine, but limited, value in our damages law, we never intended to bar well-established common law causes of action, such as those for neglect in providing professional services. Rather, the rule was primarily intended to limit actions in the product liability context, and its application should generally be limited to those contexts or situations where the policy considerations are substantially identical *745 to those underlying the product liability type analysis.... The rule, in any case, should not be invoked to bar well-established causes of actions in tort...." (Moransais, supra, 744 So.2d at p. 983, fn. omitted, italics added.) The court in Moransais concluded by stressing that "`[i]f" the doctrine were genuinely applied to bar "all tort claims for economic losses without accompanying personal injury or property damage," the rule would wreak havoc on the common law of torts.'" (Ibid., italics added.)
Instead of expanding the reach of Seely's rule barring recovery of commercial expectation damages beyond its proper original and intended scope, and instead of reaching to distinguish and disapprove established California Court of Appeal decisions that appropriately have limited the scope of Seely's dictum in the context of serious building code violations, we should, like the Florida Supreme Court, recognize the appropriate limited reach of the Seely doctrine so that it does not preclude application of traditional rules of negligence permitting limited and rational recovery of correction costs in the circumstances here presented.

II.
Even outside the construction defect context, past California decisions do not support the majority's conclusion that the dictum in Seely, supra, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, properly should be interpreted to bar a plaintiff in a negligence action from recovering damages in the absence of personal injury or physical property damage.
For example, in Potter v. Firestone Tire & Rubber Co. (1993) 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795 (Potter), a case in which the plaintiffs were negligently exposed to carcinogens in their drinking water, we approved the plaintiffs' recovery of costs for medical monitoring, prior to any actual manifestation of personal injury. (Id., at p. 974, 25 Cal.Rptr.2d 550, 863 P.2d 795.) Our reasoning in Potter in permitting the plaintiffs to recover the costs of medical monitoring is instructive here.
First, Potter, supra, 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, employing established tort analysis, allowed recovery of costs to monitor an increased risk of future illness even though there was no "present physical injury or illness" (id, at p. 974, 25 Cal.Rptr.2d 550, 863 P.2d 795), upon a showing that the need for such monitoring was a reasonably necessary response to the defendant's negligent acts. (Id., at p. 1009, 25 Cal.Rptr.2d 550, 863 P.2d 795.) The same reasoning applies here: Costs to remedy the most serious building code safety violations should be allowed to the extent they are a reasonably prudent and necessary response to the defendants' negligent acts, incurred to avoid or minimize the damage that will result from such negligence.
Second, Potter, supra, 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, approved the recovery of these limited damages, without regard to the majority's broad reading of the Seely dictum. Potter is obviously distinguishable from Seely, in that Potter addressed medical monitoring costs designed to guard against severe personal injury, whereas the Seely dictum was addressed to the question of allowing recovery of potentially limitless lost profits and lost commercial expectations. In the same fashion, the present case also is distinguishable from Seelyhere we are concerned with repair costs designed to guard against severe personal injury and property damage caused by negligent construction of residential housing. Seely's dictum did not stand in the way of allowing monitoring costs in Potter, and it does not stand in the way of allowing repair costs here.
Third, as plaintiffs observe in their briefs, and as Potter, supra, 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, stressed (id., at pp. 1005-1006, 25 Cal.Rptr.2d 550, 863 P.2d 795), Civil Code section 3333 provides *746 that a plaintiff may recover in negligence damages "for all the detriment proximately caused thereby" (italics added) the statute imposes no requirement of a showing of present physical injury or property damage.[3] This statute and comparable provisions of the Restatement Second of Torts (§§ 7, 910, & 917) are at odds with the majority's broad application of the Seely dictum and with its holding that, in the absence of present physical injury or property damage, costs to remedy the most serious building code safety violations conceded here are not recoverable in negligence.
Fourth, just as we acknowledged in Potter, supra, 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, with regard to the various policy reasons supporting recovery of medical monitoring costs in that case (id., at p. 1008, 25 Cal.Rptr.2d 550, 863 P.2d 795), here as well, policy factors relating to public safety, deterrence, mitigation of damages, economic efficiency, and "societal notions of fairness and elemental justice" (ibid.) all militate in favor of allowing the limited recovery proposed.
Finally, as was true with regard to the medical monitoring costs at issue in Potter, supra, 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, the policy factors supporting the conclusion that we should allow recovery of costs to repair the most serious safety code defects here at issueconsiderations aimed at ensuring that known safety risks in our housing stock are avoided, or at least correctedin this case militate in favor of adopting a "fund remedy" procedure that we described with approval in Potter, supra, 6 Cal.4th at page 1010, footnote 28, 25 Cal.Rptr.2d 550, 863 P.2d 795.[4]

III.
As the majority implicitly concedes, the scope of Seely's dictum, supra, 63 Cal.2d at page 18, 45 Cal.Rptr. 17, 403 P.2d 145, has been limited in a variety of contexts by decisions allowing such recovery upon a proper showing based upon the familiar six-factor test set out in Biakanja v. Irving (1958) 49 Cal.2d 647, 320 P.2d 16 (Biakanja) and J'Aire Corp. v. Gregory (1979) 24 Cal.3d 799,157 Cal.Rptr. 407, 598 P.2d 60 (J'Aire). In light of that authority, the majority finds it necessary to paraphrase the question before us as follows: "Does the law of negligence protect plaintiffs' economic interests in having houses that fully comply with the building codes, measured by the cost of repairs or diminished value associated with noncompliance, even [though the asserted harm to those interests is unaccompanied by any injury to person or property?" (Maj. opn., *747 ante, 101 Cal.Rptr.2d at p. 732, 12 P.3d at p. 1137, italics added.)
By reformulating the question in this manner, the majority skews the inquiry and fails adequately to consider that even if a negligence action cannot be maintained for the costs of remedying every minor building code violation, general common law negligence principles support a cause of action for the costs of correcting serious building code safety violations that pose a significant risk of death, serious personal injury, or considerable property damage if left unremedied.[5]
In applying the traditional six-factor test, the majority determines with very little discussion that four of the six relevant factors set out in Biakanja, supra, 49 Cal.2d at page 650, 320 P.2d 16, and J'Aire, supra, 24 Cal.3d at page 804, 157 Cal.Rptr. 407, 598 P.2d 60, support plaintiffs' right to sue in negligence for repair costs, but that two of the factors do not support a negligence action for costs of repair. The majority applies these factors out of their traditional order, and I shall do so here as well, addressing last the two assertedly problematic factors.

A.
Factor (1): The extent to which the transaction was intended to affect plaintiffs. The majority, in a single sentence, "assume[s] for argument's sake that the conduct of a person engaged in construction is `intended to affect' foreseeable purchasers of the property." (Maj. opn., ante, 101 Cal.Rptr.2d at p. 732, 12 P.3d at p. 1138.) It is unclear why the majority includes that qualification; this factor is quite clearly met, and is in fact established law, as the Court of Appeal which ultimately agreed with the majority's conclusion that the repair costs sought by plaintiffs are not recoverable readily acknowledged. The appellate court stated: "It is undisputed that the 162 unit residential condominium project at issue in the pending Provencal case was developed and built by [codefendant] Lyon. The subcontractors were also involved in the construction of Provencal. It is also undisputed that the Aas [plaintiffs'] *748 single-family homes were developed and built by Lyon, and that Lyon subcontracted with several design and construction professionals to design and build the homes, [¶] These facts are sufficient to satisfy the first Biakanja factor under well-settled case law." (Italics added.) I believe the majority should acknowledge, and not minimize, plaintiffs' strong showing with regard to this factor.

B.
Factor (4): The closeness of the connection between defendants' conduct and the injury suffered. The majority also "assume[s] that a sufficiently `close[ ] connection [exists] between ... defendant's conduct' and the alleged defects." (Maj. opn., ante, 101 Cal.Rptr.2d at p. 733, 12 P.3d at p. 1138.) Again, the Court of Appeal expressed no hesitation on this point, stating: "Lyon and subcontractors do not vigorously contend their conduct is remote to [plaintiffs'] alleged harm. Their alleged conduct is sufficiently connected to the alleged construction defects alleged in the [plaintiffs'] pleadings."

C.
Factor (5): The moral blame attached to defendants' conduct. The majority concedes that "some `moral blame' arguably `attach[es]' to many deviations from the building codes," but asserts that "the degree of blame would appear to depend upon the nature of the deviation." (Maj. opn., ante, 101 Cal.Rptr.2d at p. 733, 12 P.3d at p. 1138, italics added.) Yet again, the Court of Appeal did not couch its review of this factor in such a grudging manner. It first quoted Chief Justice Traynor's discussion in Connor, supra, 69 Cal.2d at page 867, 73 Cal.Rptr. 369, 447 P.2d 609, of the importance of providing a remedy in negligence for homeowner victims of defective construction, and then noted:
"Chief Justice Traynor's observations are relevant here in light of [plaintiffs'] allegations and offers of proof that the construction of their homes fell below the standard of care and failed to comply with the minimum requirements for shear walls and fire walls as set forth in the Uniform Building Code, and the minimum requirements set forth in the National Electrical Code. In Huang, supra, 157 Cal.App.3d at page 424, 203 Cal.Rptr. 800, the court addressed the moral blameworthiness of violating building codes and contracting regulations: `[Considering the importance of the minimum standards for housing set forth in the pertinent provisions of the Uniform Building Code, the violation of those standards involves sufficient "moral blame" to meet the fifth of the six criteria adopted in J'Aire....'
"[Plaintiffs] assert that assessing moral blame for violating building codes reflects California's strong policy in favor of quality construction of homes. We agree.... `[N]egligent construction principles rest on a policy determination that purchasers of homes should not be harmed by defective housing caused by a breach of the duty to construct properly...."'
Once again, I submit that the majority ought to acknowledge, and not minimize, plaintiffs' strong showing with regard to this factor.[6]

D.
Factor (6): The policy of preventing future harm. The majority concedes that this is "probably plaintiffs' strongest argument." (Maj. opn., ante, 101 Cal.Rptr.2d at p. 734, 12 P.3d at p. 1140.) The majority notes that the policy of preventing future *749 harm "might be served by a rule of tort liability" that permits recovery of repair costs on the facts alleged here. (Ibid., italics added.) The majority further acknowledges that it "might be less expensive," as plaintiffs argue, "to require builders to pay to correct defects as soon as they are detected rather than after property damage or personal injury has occurred." (Id. at p. 735, 12 P.3d at p. 1140, italics added.)
After conceding these points, the majority proceeds, however, to diminish the weight of this factor by the majority's depiction of the present suit, asserting that plaintiffs seek to make the "builders, in effect, the insurers of building code compliance, even as to defects that have not caused property damage or personal injury." (Maj., opn., ante, 101 Cal.Rptr.2d at p. 735, 12 P.3d at p. 1140, italics added.)
Contrary to the majority's mischaracterization, plaintiffs' action in this case clearly does not attempt to make defendants "insurers." The suit simply seeks to have defendants pay limited repair costs necessitated by defendants' concededly negligent conduct in constructing plaintiffs' homes. Moreover, the majority fails to acknowledge that any liability on the part of defendants plainly is limited in durationit expires, by statute, 10 years after the completion of construction (Code Civ. Proc., § 337.15)which period may have already elapsed in this litigation.[7]
The majority also asserts that allowing the limited form of recovery sought here "should also be unnecessary to the extent buyers timely enforce their contract, warranty and inspection rights, and to the extent building authorities vigorously enforce the applicable codes for new construction." (Maj., opn., ante, 101 Cal. Rptr.2d at p. 735, 12 P.3d at p. 1140, italics added.) That is true, but it begs the question that we are required to answer: What remedy is there when there is no privity, and hence there are no contract rights, or when there is privity, but disclaimers or technical notice rules preclude enforcement of contract rights (see ante, at pp. 722-723, 12 P.3d at pp. 1128-1130), or when there is inspection, but the defect cannot reasonably be noticed by the usual home buyer (see Connor, supra, 69 Cal.2d at p. 867, 73 Cal.Rptr. 369, 447 P.2d 609; Kriegler, supra, 269 Cal.App.2d at p. 228, 74 Cal.Rptr. 749)or when, as apparently has occurred with alarming frequency, local building inspectors (for whatever reason) fail to notice and require correction of serious building code safety violations? Does the "policy in favor of preventing future harm" call for recognition of a limited negligence action to fill the gaps in such circumstances? The majority never satisfactorily answers this crucial question.
Again, the Court of Appeal had no trouble with this factor. It wrote:
"The policy of preventing future harm is fundamental to the tort system, and California case law demonstrates this policy applies to safeguarding against preventable construction defects which result in physical injuries to people and property.... [As] our high court [has] stated: `[T]he prevention of future negligent construction of buildings upon insufficiently supportive material would not be furthered by exempting [the builder] from liability for his negligence. [Citations.]'
"... [I]n Connor, supra, 69 Cal.2d at pages 867-868, 73 Cal.Rptr. 369, 447 P.2d 609, Chief Justice Traynor eloquently expressed the judiciary's concern for proper construction of housing in California: `The admonitory policy of the law of torts calls for the imposition of liability on [defendant] for its conduct in this case. Rules that tend to discourage misconduct are particularly appropriate when applied to an established industry, [¶] By all the *750 foregoing tests, [defendant] had a duty to exercise reasonable care to prevent the construction and sale of seriously defective homes to plaintiffs.... In any event, there is no enduring social utility in fostering the construction, of seriously defective homes."
Here, [plaintiffs] have alleged causes of action in negligence against a home developer, a general contractor, and various housing subcontractors for recovery of damages resulting, from numerous alleged construction defects, including but not limited to serious violations of minimum standards set forth in the, Uniform Building Code and other governing codes. The policy concern for ensuring proper construction of vital. structural housing components, such as shear walls, is meant to protect not only the physical structure, but also the personal safety of all homeowners." (Italics added.)
In an immediately following footnote, the Court of Appeal observed: "In this regard, we take judicial notice of one of the recommendations of the California State Seismic Commission, which investigated the Northridge earthquake under our Governor's Earthquake Executive Order: `The greatest opportunity to ensure seismic safety is during a building's design and construction.... The Northridge earthquake and other past earthquakes have clearly and repeatedly demonstrated the remarkable effectiveness of paying attention to quality in reducing earthquake losses. Quality assurance is the single most important policy improvement needed to manage California's earthquake risk.' (California Seismic Safety Commission, `Northridge Earthquake: Turning Loss To Gain,' Dec. 1, 1994, at p. 22, italics added.)"[8]
In my view, the policy of preventing future harm operates here as a factor that very strongly militates in favor of recognizing a right of action in negligence to recover costs to remedy safety code violations that pose a serious threat of injury to the residents of and visitors to the dwellings here at issue. Once again, I submit that the majority should frankly concede, rather than attempt to minimize, plaintiffs' strong showing with regard to this factor.

E.
Factor (2): The foreseeability of harm to plaintiffs. The majority's entire treatment of this factor is as follows: "[T]o ask . . . whether the harm to plaintiffs was `foreseeab[le]' [citation] simply begs the question: What harm?" (Maj. opn., ante, 101, Cal.Rptr.2d at p. 732, 12 P.3d at p. 1138.)
In contrast to the majority's approach, the Court of Appeal stated: "[T]he Supreme Court cases that have addressed the second Biakanja factor ... in the construction defect context have held that harm to homeowners caused by negligent construction is foreseeable. [Citations.] [¶] ... [Here,] as to the alleged violations of governing building codes, it is foreseeable that such code violations may result in otherwise preventable injury to persons or other property. For example, it is foreseeable that an insufficient fire wall in a condominium may fail in the event there is a fire in an adjoining unit, resulting in a conflagration that could have been prevented had the fire wall been constructed in compliance with the minimum building code safety standards." (Italics added.)
It is foreseeable that a reasonably prudent person, made aware of seriously deficient shear walls and fire walls in his or her home, would suffer appreciable present harm by virtue of being exposed to, and thereby having the legal duty to address (see post, 101 Cal.Rptr.2d at pp. 751-752, 12 P.3d at pp. 1155-1156), a *751 known unreasonable risk to personal safety and to property.

F.
Factor (3): The degree of certainty that plaintiff's suffered injury. This is the factor that the majority finds is both (i) the most important in this case, and (ii) the one that presents a "relatively objective obstacle to plaintiffs' claim" to recover the cost of remedying the serious building code safety violations conceded on this record. (Maj. opn., ante, 101 Cal.Rptr.2d at p. 746, 12 P.3d at p. 1150.) The majority begins with the premise that "[c]onstruction defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses, do not comfortably fit the definition of `"appreciable harm"'an essential element of a negligence claim." (Id., at p. 732, 12 P.3d at p. 1137, citing Davies v. Krasna (1975) 14 Cal.3d 502, 513, 121 Cal.Rptr. 705, 535 P.2d 1161 (Davies).)
Davies, supra, 14 Cal.3d 502, 121 Cal. Rptr. 705, 535 P.2d 1161, is not on point. That case addressed the question at what point, after a breach of duty, a plaintiff suffers damages sufficient to begin the running of the statute of limitations. Davies did not concern, and did not address, whether, and under what conditions, the incurring of reasonably necessary repair costs in the absence of personal injury or property damage would establish a sufficient degree of certainty that injury had been suffered. Of course, a decision does not stand for a proposition that it did not address or consider.
The majority nevertheless relies upon Davies, supra, 14 Cal.3d 502, 121 Cal.Rptr. 705, 535 P.2d 1161, to support its implicit conclusion that on the facts presented, there exists an insufficient degree of certainty that plaintiffs have suffered harm.[9] I believe that under the standard of review articulated by the majority, the conclusion it reaches is incorrect.
As the majority asserts, "the question is whether, disregarding conflicting evidence, indulging in every legitimate inference that may be drawn from the evidence, and viewing the record in the light most favorable to plaintiffs," there is substantial evidence to support a judgment in plaintiffs' favor. (Maj. opn., ante, 101 Cal. Rptr.2d at p. 723, 12 P.3d at p. 1130, italics added.) In my view, if we faithfully apply that standard, we must conclude that there is substantial evidence establishing with sufficient certainty that with regard to the most serious safety code violations at issue in this litigation, plaintiffs have suffered appreciable present injury or harm.
The Court of Appeal below expressly found that the crucial "degree of certainty that plaintiffs suffered injury" factor was met on these facts. The Court of Appeal stated: "[W]e agree with the Huang court's conclusion that evidence of a negligent failure by a developer or contractor to comply with the minimum standards set forth in governing building codes, supported by evidence of the cost to repair the building code violations, is sufficient to *752 satisfy the Biakanja `degree of certainty of harm' factor." The Court of Appeal quoted extensively from offers of proof by experts retained by both plaintiffs and defendants, to the effect that the dwellings contained inadequate shear walls and fire walls, and that repairs to correct these problems would cost "several hundreds of thousands of dollars;" and then concluded: "[Plaintiffs'] offer of proof, and the construction defect allegations in [the] complaint in connection with the negligence cause of action, are sufficient to show the requisite certainty ... that [plaintiffs] have suffered latent harm."
As suggested above, I agree with the majority to the extent it declines to allow recovery in negligence for the cost of repairing construction defects that pose no significant risk of serious personal injury or property damage. Accordingly, I would not recognize a negligence action to recover the costs of repairing matters such as "discolored drain stoppers, and inoperable garbage disposals." (Maj. opn., ante, 101 Cal.Rptr.2d at p. 733, 12 P.3d at p. 1138.) On the other hand, I believe that by being subjected to the risk posed by defective shear walls and fire walls, plaintiffs have suffered appreciable present compensable injury.[10] Indeed, plaintiffs' knowledge of these defects places upon them a legal duty to make necessary repairs or corrections.
Most of the plaintiffs in these consolidated cases (those who live in condominiums) are under legal compulsion, through their condominium association, to repair common areasand this would certainly include, a duty to remedy known major safety violations in shear walls and fire walls located in common areas that had not yet caused actual physical damage or injury. (Civ.Code §§ 1364, subd. (a) [duty to repair common areas], 1351, subd. (b) [common area defined].)
Similarly, all single-family-structure homeowner plaintiffs in this proceeding are under a duty to disclose known defects to potential purchasers, and perhaps more importantly, like any possessor of real property, they also are under a legal obligation to take reasonable steps to remedy known safety defects in or on their own property. A reasonably prudent homeowner, learning of, for example, the serious shear wall or fire wall defects in his or her home, would act to correct or repair those defects, in order to avoid unreasonable risk of collapse of the structure during a windstorm or earthquake, or in order to avoid rapid spread of a fire from one room to others.
Plaintiffs' showing here is no less than that found to be adequate in similar circumstances in Cooper, supra, 56 Cal. App.3d 860, 128 Cal.Rptr. 724, Huang, supra, 157 Cal.App.3d 404, 203 Cal.Rptr. 800, Sumitomo Bank v. Taurus Developers, *753 Inc., supra, 185 Cal.App.3d 211, 229 Cal. Rptr. 719, and in various out-of-state decisionsmost notably, the Maryland high court's decision in Whiting-Turner, supra, 308 Md. 18, 517 A.2d 336 and the Florida Supreme Court's decision in Moransais, supra, 744 So.2d 973. Nor is plaintiffs' showing any less than that found to be adequate in analogous circumstances in Potter, supra, 6 Cal.4th 965, 25 Cal. Rptr.2d 550, 863 P.2d 795.
I submit that on these facts compensable present injury to plaintiffs is reasonably certain, because a reasonably prudent person, having become aware of the unreasonable risk posed by known building code safety defects such as inadequate shear walls and fire walls, would act to repair or correct those defects. I would recognize a limited negligence action as described above, and, in light of the public interest in ensuring that such repairs actually are undertaken, I would require court-supervised disbursement of damages awarded in such cases. (See Potter, supra, 6 Cal.4th at p. 1010, fn, 28, 25 Cal.Rptr.2d 550, 863 P.2d 795, quoted ante, fn. 4.)[11]

IV.
California is prone to earthquakes and, tragically, the negligent construction of residential housing almost surely will result in the deaths and injury of numerous current and future residents of this state, as it has in the past. In the context of a case such as the one now before us, the goal of tort law is to minimize, in an appropriate and balanced manner, the number of those deaths and injuries. In light of today's majority opinionwhich misapplies and improperly disapproves California's established case law and, in failing to recognize an appropriate and limited right to recover costs to remedy serious safety code violations, rejects the reasoning of well-considered decisions of our sisterstate courtsthe obligation falls upon the Legislature to correct this court's unfortunate misstep in the development of the law, and to provide the protection that California residents deserve.
Concurring and Dissenting Opinion by MOSK, J.
Because I believe it is economically efficient to provide plaintiffs with a remedy to repair conditions that allegedly pose a serious safety hazard, I respectfully dissent from the majority's contrary conclusion. I believe the Supreme Court of Indiana pointed out quite well the inefficiency inherent in the economic loss rule as applied to such conditions: "If there is a defect in a stairway and the purchaser repairs the defect and suffers an economic loss, should he fail to recover because he did not wait until he or some member of his family fell down the stairs and broke his neck?" (Barnes et ux. v. Mac Brown & Co., Inc. et al, (1976) 264 Ind. 227, 230 [342 N.E.2d 619, 621].) Thus, to answer the majority's rhetorical question, "What harm?" (maj. opn, ante, 101 Cal.Rptr.2d at p. 732, 12 P.3d at p. 1138), I would say, the harm that will arise when homeowners, believing, as humans are wont to do, that injury only befalls others, fail to repair hazardous conditions.
It is evident that many Californians live in modern mass-market housing. It appears, moreover, that cutting corners is a prevailing problem in the development industry. The descriptions of construction defects in the numerous letter briefs we have received from the construction law bar suggest as much. The briefs describe the willingness of some developers to evade or stint the Uniform Building Code's safety requirements, among other elements. In this context, the majority's result *754 is likely, as one litigant put it, to create "an invitation for developers, general contractors and subcontractors to ignore [construction] Code requirements when building and developing homes."
The majority tacitly acknowledge the risks of inefficiency their rule generates: "[T]o require builders to pay to correct defects as soon as they are detected rather than after property damage or personal injury has occurred might be less expensive. On the other hand, such a rule would likely increase the cost of housing by an unforeseeable amount as builders raised prices to cover the increased risk of liability." (Maj. opn., ante, 101 Cal. Rptr.2d at p. 735, 12 P.3d at p. 1140.) The first sentence in the quotation is almost certainly correct, as it is less costly to society to require a contractor to nail down the loose stair than to pay for hospitalization after a needless tumble down the flight of steps. The second sentence, by contrast, even if correct, assumes that builders are inadequately constructing mass-market housingthere is no: risk of liability if the housing is correctly built. And it can only be correct if builders pass along the savings realized by poor construction to their customers, rather than realizing increased profits from deficient building practices. I do not share the majority's evident assumption that the former is correct.
I would adopt a view similar to that of Judge Richard Posner in Eljer Mfg., Inc. v. Liberty Mut. Ins. Co. (7th Cir.1992) 972 F.2d 805 (Eljer). Interpreting comprehensive general liability insurance policies that defined the term "property damage" as "`physical injury to ... tangible property'" (id. at p. 807), but considering facts similar to those of this case, Posner wrote that physical injury to property occurs when it "results from ... physical linkage, as when a potentially dangerous product is incorporated into another and, because it is incorporated and not merely contained (as a piece of furniture is contained in a house but can be removed without damage to the house), must be removed, at some cost, in order to prevent the danger from materializing. There is an analogy to fixtures in the law of real and personal propertyimprovements to property that cannot be removed without damaging it. See, e.g., UCC § 9-313." (Id. at p. 810, italics added.)[1]
The Eljer approach obviates the need to consider the Biakanja factors (Biakanja v. Irving (1958) .49 Cal.2d 647, 650, 320 P.2d 16; see Ott v. Alfa-Laval Agri, Inc. (1995) 31 Cal.App.4th 1439, 1449, 37 Cal.Rptr.2d 790)although even under those factor's I believe, like the Chief Justice but unlike the majority, that damages are sufficiently ascertainable to justify liability. The rule I favor would state that property damage occurs when what may be termed "fixtures" for purposes of discussion, inseparable from the structure of the houses or condominiums and inaccessible for repair without destroying existing features, are negligently built or installed. (Cf. Cal. U. Com. Code, § 9102, subd. (a)(41).)[2]
We here consider alleged latent defects, capable of causing serious injury or major property damage, that may only be found years or decades after the developer caused them, yet require repair to avoid *755 later injury or major property loss. (In this regard, Code Civ.Proc, § 337.15 permits recovery for property damage caused by latent defects in construction only for 10 years after the work is substantially completed. The statute of limitations is already a substantial bar to any threat of limitless liability.) I believe a narrow rule could be drawn to provide a tort remedy for such defects. It seems that a finely crafted rule would not need to apply to such items as negligent heating, air conditioning, and ventilation work, or, to refer to the majority's rather dismissive examples, "doors that are out of plumb, discolored drain stoppers, and inoperable garbage disposals" (maj. opn, ante, 101 Cal.Rptr.2d at p. 733, 12 P.3d at p. 1138). (See Council of Co-Owners v. Whiting Turner (1986) 308 Md. 18, 35, fn. 5 [517 A.2d 336, 345] [limiting recovery to fixing defects that pose "a clear danger of death or personal injury"].)[3] I regret the majority's unwillingness to adopt even a minimal safeguard. The proper view, I believe, is that articulated in Biakanja: "Liability has [been] imposed, in the absence of privity, upon suppliers of goods and services which, if negligently made or rendered, are `reasonably certain to place life and limb in peril.'" (Biakanja v. Irving, supra, 49 Cal.2d 647, 649, 320 P.2d 16.)
NOTES
[1] The following is a representative excerpt from plaintiff's offer of proof:

"5. During the investigation at Provencal in this case, engineers ... observed violations of the Uniform Building Code, including failures to properly construct shear walls and failures to properly connect shear walls to other building components. Such shear walls and connections are required under the Uniform Building Code to prevent or minimize property damage and personal injury in the event of seismic and wind forces....
"6. During the investigation at Provencal in this case, architects . . . observed violations of the Uniform Building Code, including failures to properly construct one-hour and two-hour fire protection in party walls. Such fire protection measures are required under the Uniform Building Code to prevent or minimize property damage and personal injury in the event of a fire....[¶] ... [¶]
"8. During the investigation of Provencal in this case, [an] electrical engineer ... observed numerous violations of the National Electrical Code, including failures to support electrical cables, improperly supported light fixtures, and improperly labeled electrical circuits.... [¶] ... [¶]
"10. For many of the Uniform Building Code and National Electrical Code violations described in paragraphs 5, 6, and 8, there has not yet been any physical property damage or personal injury...."
[2] Plaintiff in Provencal subsequently moved to amend its complaint to allege a cause of action for breach of implied warranty. Plaintiff's request for judicial notice of defendant Lyon's memorandum in opposition to the motion, filed after the Court of Appeal affirmed the trial court's ruling, is denied.
[3] The trial court explained: "I would address [at trial] any issues that are over and above my ruling that you felt were close calls and listen to what your proffer might be at the appropriate time." There is, thus, no basis for assuming that every item on the exhaustive lists of construction defects attached to defendants' motions in limine is deemed excluded, even if plaintiffs are able to prove that a particular defect has actually caused property damage.
[4] Sabella v. Wisler (1963) 59 Cal.2d 21, 27-30, 27 Cal.Rptr. 689, 377 P.2d 889; Stewart v. Cox (1961) 55 Cal.2d 857, 861-863, 13 Cal. Rptr. 521, 362 P.2d 345; Hale v. Depaoli (1948) 33 Cal.2d 228, 230-232, 201 P.2d 1; Sumitomo Bank v. Taurus Developers, Inc. (1986) 185 Cal.App.3d 211, 223-224, 229 Cal. Rptr. 719; Huang v. Garner (1984) 157 Cal. App.3d 404, 419-425, 203 Cal.Rptr. 800; Cooper v. Jevne (1976) 56 Cal.App.3d 860, 867-869, 128 Cal.Rptr. 724.
[5] Stearman v. Centex Homes (2000) 78 Cal. App.4th 611, 613, 92 Cal.Rptr.2d 761 (citing the many decisions applying strict liability to construction defects); Avner v. Longridge Estates (1969) 272 Cal.App.2d 607, 609-615, 77 Cal.Rptr. 633; Kriegler v. Eichler Homes, Inc. (1969) 269 Cal.App.2d 224, 227-229, 74 Cal. Rptr. 749.
[6] Stearman v. Centex Homes, supra, 78 Cal. App.4th 611, 613-614, 617-623, 92 Cal. Rptr.2d 761.
[7] Courts in other jurisdictions have reached various conclusions on this subject. South Carolina broadly holds builders liable in tort for all deviations from applicable building code and industry standards that diminish the value of a house. (Kennedy v. Columbia Lumber & Mfg. Co. (1989) 299 S.C. 335, 384 S.E.2d 730, 736-738.) Maryland more narrowly permits homeowners to recover in a negligence action the reasonable cost of correcting construction defects that present "a clear danger of death or personal injury," but not conditions that present merely "a risk to general health, welfare, or comfort..." (Council of Co-Owners v. Whiting Turner (1986) 308 Md. 18, 517 A.2d 336, 344-345 & fn. 5). A North Carolina decision does not clearly identify the circumstances that will support recovery, but holds that the plaintiffs stated a cause of action for negligence by alleging they "were forced to undergo extensive demolition and repair work to correct the defective, dangerous and unsafe conditions caused by the defendant's negligence." (Oates v. Jag (1985) 314 N.C. 276, 333 S.E.2d 222, 224-226.)

In contrast, the Supreme Court of Nevada, after tentatively rejecting the economic loss rule in construction defect cases (Calloway v. City of Reno (1997) 113 Nev. 564, 939 P.2d 1020, 1024-1026), reversed course on rehearing and held that no liability exists for defects that cause damage only to the house and its components. (Calloway v. City of Reno (Nev. 2000) 993 P.2d 1259, 1263-1270 [trial court properly dismissed negligence claims alleging that defective framing caused water intrusion, damage to flooring and ceilings, and structural and wood decay].)
[8] The six factors were: "the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (Biakanja, supra, 49 Cal.2d 647, 650, 320 P.2d 16.)
[9] See generally Stearman v. Centex Homes, supra, 78 Cal.App.4th 611, 613, 92 Cal. Rptr.2d 761. Compare Peterson v. Superior Court (1995) 10 Cal.4th 1185, 1200, 43 Cal. Rptr.2d 836, 899 P.2d 905, Cronin v. J.B.E. Olson Corp. (1972) 8 Cal.3d 121, 130, 104 Cal.Rptr. 433, 501 P.2d 1153, and Price v. Shell Oil Co. (1970) 2 Cal.3d 245, 251 and footnote 6, 85 Cal.Rptr. 178, 466 P.2d 722 (all acknowledging the doctrine's potential applicability to persons in the business of residential construction).
[10] The concurring and dissenting justices would hold that property damage occurs when a defective component is incorporated into a house. (Cone. & dis. opn. of Mosk, J., 101 Cal.Rptr.2d at pp. 754-755, 12 P.3d at pp. 1157-1158; see also cone. & dis. opn. of George, C.J., at p. 753, fn. 11, 12 P.3d at p. 1156, fn. 11.) The decision offered as support for that view, Eljer Mfg., Inc. v. Liberty Mut. Ins. Co. (7th Cir.1992) 972 F.2d 805, however, offers its conclusion not as a rule of tort liability but as an interpretation of contractual language in an insurance policy. While we intimate no view as to Eljer's correctness as a matter of California law, we find the decision insufficiently relevant to the question before us to be of any assistance.
[11] Plaintiffs also argue that Seely, supra, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, does not apply to the negligent performance of services, as distinguished from the negligent manufacture of products, but the basis for that argument appears, once again, to be that J'Aire, supra, 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60, takes precedence over Seely. (See North American Chemical Co. v. Superior Court, supra, 59 Cal.App.4th 764, 778-785, 69 Cal.Rptr.2d 466, and Huang v. Garner, supra, 157 Cal.App.3d 404, 421-424, 203 Cal.Rptr. 800 [both concluding that liability under J'Aire is unaffected by Seely]; cf. Cooper v. Jevne, supra, 56 Cal.App.3d 860, 867-869, 128 Cal.Rptr. 724 [relying on Biakanja, supra, 49 Cal.2d 647, 320 P.2d 16, rather than J'Aire, to reach the same conclusion].)
[12] In addition to these cases cited by plaintiffs, the Chief Justice relies on Connor v. Great Western Sav. & Loan Assn. (1968) 69 Cal.2d 850, 73 Cal.Rptr. 369, 447 P.2d 609, Krusi v. S.J. Amoroso Construction Co. (2000) 81 Cal.App.4th 995, 97 Cal.Rptr.2d 294, Stearman v. Centex Homes, supra, 78 Cal. App.4th 611, 92 Cal.Rptr.2d 761, and Keru Investments, Inc. v. Cube Co. (1998) 63 Cal. App.4th 1412, 74 Cal.Rptr.2d 744. None of these cases purports to hold that a plaintiff may recover for construction defects that have not caused damage to other property.

In Connor v. Great Western Sav. & Loan Assn., supra, 69 Cal.2d 850, 73 Cal.Rptr. 369, 447 P.2d 609, this court held that persons whose homes "suffered serious damage from cracking caused by ill-designed foundations" (id. at p. 856, 73 Cal.Rptr. 369, 447 P.2d 609) could sue the construction lender as the joint venturer of the developer on the theory that it owed the plaintiffs a duty to "exercise reasonable care to protect them from damages caused by major structural defects" (id. at p. 866, 73 Cal.Rptr. 369, 447 P.2d 609). Thus, to the extent Connor might be thought relevant to the case before us, it is entirely consistent with the rule we apply today. (The Legislature has rejected Connor's holding that construction lenders are liable in negligence for construction defects. See Civ.Code, § 3434.)
The courts in Krusi v. S.J. Amoroso Construction Co., supra, 81 Cal.App.4th 995, 1005, 97 Cal.Rptr.2d 294, and Keru Investments, Inc. v. Cube Co., supra, 63 Cal.App.4th 1412, 1423-1425, 74 Cal.Rptr.2d 744, held simply that causes of action for construction defects accrued when the defects caused damage and belonged to the persons who owned the buildings at that time, rather than to the subsequent purchasers. Because the courts in both cases held the plaintiffs lacked standing to sue, neither court faced any question of liability for purely economic damages. In any event, the buildings at issue in both cases had actually suffered major structural damage as a result of construction defects. (Krusi, at p. 998, 97 Cal.Rptr.2d 294; Keru, at p. 1415, 74 Cal.Rptr.2d 744.) The court in Stearman v. Centex Homes, supra, 78 Cal. App.4th 611, 616-623, 92 Cal.Rptr.2d 761, held merely that strict liability applies when a defective component of a house damages a nondefective component. (See 101 Cal. Rptr.2d p. 728, 12 P.3d p. 1134, ante.)
[13] Amicus curiae explains in detail how alleged defects that might on "[i]nitial impression[]" seem "trivial, nitpickey and even ridiculous," might cause or indicate serious problems. "Closet shelving, interior doors not fitting properly, sagging roof rafters, spalling plaster, [and] GFI [ground fault interrupt] receptacles missing" are cited as examples. Expert testimony at trial, amicus curiae speculates, might show that "the location of the closet shelving in conjunction with the lighting poses a fire hazard and violates the National Electrical Code. The interior doors may not fit properly because the buildings/homes have moved due to structural problems or soil issues. The roof rafters may be sagging because they were not attached properly, and their installation violates the Uniform Building Code. The plaster could be spalling due to missing structural components, and by the way, maybe the plaster is supposed to serve as some shear. The missing GFI receptacles pose a fire hazard and a life safety threat to adults and children and the fact that they are missing violates the National Electrical Code."
[14] This case illustrates the problem. The Chief Justice apparently concludes that the defects alleged in this case put plaintiffs' homes at risk of collapse or fire. (Cone. & dis. opn. of George, C.J., post, 101 Cal. Rptr.2d at p. 738, 12 P.3d at p. 1143.) To be sure, plaintiffs have alleged that shear and fire walls do not comply with the applicable building codes, and that the purpose of codes for these components is to protect against those sorts of harm. (See ante, at p. 722 & fn. 1, 12 P.3d p. 1129 & fn. 1.) Yet, as the trial court recognized (see ante, at p. 722, 12 P.3d p. 1129), this does not necessarily mean that any given defect is sufficiently grave to pose a realistic risk of serious damage. (See also ante, at pp. 732-734, 12 P.3d pp. 1137-1140.)
[15] Plaintiffs may be surprised to read in the Chief Justice's concurring and dissenting opinion that he believes they have abandoned this claim. Plaintiffs did abandon a claim for so-called stigma damages, representing the residual loss of market value after repairs have been made, after losing on this issue in the Court of Appeal. As that court explained, no reported decision in this state appears to authorize such recovery; we intimate no view on the matter.

In contrast, diminished value is simply one of the standard alternative measures of damage for injury to property. The successful plaintiff in such cases ordinarily recovers either the diminution in market value attributable to the injury or the cost of repairs, whichever is less (Mozzetti v. City of Brisbane (1977) 67 Cal.App.3d 565, 576, 136 Cal.Rptr. 751), although the rule is not rigid and the court may award the greater amount in appropriate circumstances (Heninger v. Dunn (1980) 101 Cal.App.3d 858, 863-864, 162 Cal. Rptr. 104; see generally 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 1461-1462, pp. 934-935). Plaintiffs understandably emphasize the cost of repairs in their briefs and argument because damages measured by the cost of repairs typically exceed damages measured by diminution in value.
This case is being remanded for further proceedings, possibly including a trial on any alleged defects that have caused property damage. (See ante, 101 Cal.Rptr.2d at pp. 722, 723, 12 P.3d at pp. 1129, 1130.) Because plaintiffs have not expressly abandoned the right to recover the diminished value of their homes, should that turn out to be the appropriate measure of damages, we see no basis on which to preclude the court from applying the ordinary law of remedies.
[16] Arguing that courts should do so, the Chief Justice cites Potter v. Firestone Tire & Rubber Co. (1993) 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795. (Cone. & dis. opn. of George, C.J., 101 Cal.Rptr.2d at pp. 746, 753, 12 P.3d at pp. 1150, 1156.) The plaintiffs in Potter sought, among other things, medical monitoring costs following their exposure to carcinogenic toxic waste. In a footnote, we noted the suggestion of "[v]arious commentators and courts ... that creation of court-supervised funds to pay medical monitoring claims as they accrue, rather than the award of a lump-sum verdict, may be a more appropriate mechanism for compensating plaintiffs in a toxic exposure case." (Id. at p. 1010, fn. 28, 25 Cal.Rptr.2d 550, 863 P.2d 795.) Nothing in the Potter decision, which we painstakingly limited to its specific factual and legal context, suggests that courts have a broad, general role in supervising the disbursement of tort recoveries.
[17] In fact, the Legislature in this term has considered and rejected proposals to make persons engaged in residential construction liable for the cost of bringing homes into compliance with the building codes, without regard to the existence of property damage (Assem. Bill. No. 1669 (1999-2000 Reg. Sess.), as introduced Mar. 15, 1999) and to create a state-sanctioned home warranty program (Assem. Bill No. 1221 (1999-2000 Reg. Sess.)). We note the Legislature is also considering a bill that would recognize a lack of "empirical data on the incidence of construction defects, the amount of construction defects litigation, and whether there is any causal relationship between shoddy construction, construction defect litigation, and the construction of new condominium and affordable housing," and commission a comprehensive study to collect such data. (Sen. Bill No. 1882 (1999-2000 Reg. Sess.).) Defendants' motion for judicial notice of these bills is granted.
[1] In the omitted footnote, the court wrote in Whiting-Tumer: "It is the serious nature of the risk that persuades us to recognize the cause of action in the absence of actual injury. Accordingly, conditions that present a risk to general health, welfare, or comfort but fall short of presenting a clear danger of death or personal injury will not suffice. A claim that defective design or construction has produced a drafty condition that may lead to a cold or pneumonia would not be sufficient." (Whiting-Turner, supra, 517 A.2d at p. 345, fn. 5.)
[2] The opinion in Moransais was filed after briefing in the present case was completed. On August 28, 2000, however, codefendant William Lyon Company filed a "Supplemental Brief of Additional Authorities," citing and discussing the recent subsequent history of a Nevada case cited in earlier briefs, and citing three other recent (and distinguishable) cases from other jurisdictions. Nonetheless, the supplemental brief failed to note that, more than one year earlier, the Florida Supreme Court effectively had overruled Casa Clara, supra, 620 So.2d 1244, the primary out-of-state case upon which Lyon had relied in its "Answer Brief on the Merits."
[3] That statute provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ.Code, § 3333.)
[4] Our opinion in Potter stated in this regard: "Various commentators and courts have suggested that creation of court-supervised funds to pay medical monitoring claims as they accrue, rather than the award of a lump-sum verdict, may be a more appropriate mechanism for compensating plaintiffs in a toxic exposure case. [Citation.] [¶] In Ayers [v. Jackson Tp. (1987)] 106 N.J. 557, 525 A.2d 287, 314, the court observed: `Although conventional damage awards do not restrict plaintiffs in the use of money paid as compensatory damages, mass-exposure toxic tort cases involve public interests not present in conventional tort litigation. The public health interest is served by a fund mechanism that encourages regular medical monitoring for victims of toxic exposure.' [Citation.] Thus, in contrast to a lump-sum payment, a fund remedy will encourage plaintiffs to spend money to safeguard their health by not allowing them the option of spending the money for other purposes. The fund remedy will also assure that medical monitoring damages will be paid only to compensate for medical examinations and tests actually administered, thus serving to limit the liability of defendants to the amount of expenses actually incurred. (Ibid.) In turn, this should tend to reduce insurance costs, both to potential defendants and the general public alike." (Potter, supra, 6 Cal.4th at p. 1010, fn. 28, 25 Cal.Rptr.2d 550, 863 P.2d 795.)
[5] Although plaintiffs' complaint sought, among other things, damages for the diminution in value of their homes, plaintiffs' briefing and argument before this court make it quite clear that they have abandoned any such claim and that they now limit their negligence claim regarding code violations that have not manifested themselves in physical injury or property damage to recovery of repair costs. Plaintiffs' joint opening brief states the issue as follows: "Can homeowners and a homeowners association . . . recover in negligence for the cost to repair violations of governing building codes . . . even though the violations have not yet caused physical property damage?" (Italics added.) This phrasing of the issue and this singular focus of recovery sought at this stage in the litigation is repeated throughout the briefing. Indeed, plaintiffs specifically assert, "the measure of damages for negligent construction is limited to the cost of repair. Imaginative consequential damages are not applicable." (Italics added.) And plaintiffs also argue that defendants in this case should be responsible "only . . . for compliance with governing building codes" and "will not be exposed to monetary damages beyond the cost of repair." Similarly, at oral argument, counsel for plaintiffs asserted that at this stage plaintiffs do not seek lost profits or any other such difficult-to-define form of damages, but instead, and only, funds necessary to address "very specific code violations for which specific repairs are designed and for which there is a known measure of damages"namely, the specific "costs to repair code violations."

Thus, the matter in contention, at this point, is simply whether, with respect to code violations that have not manifested themselves in physical injury or property damage, we should recognize a limited negligence action for recovery of specific and definable repair costs. In my view it does not advance this inquiry for the majority to invoke repeatedly plaintiffs' now abandoned claim for damages relating to the diminished value of their homes.
[6] At the same time, I completely agree with the majority's additional assertion that "we may ... reasonably assign reduced moral blame to less serious defects ... such ... as ... discolored drain stoppers, and inoperable garbage disposals." (Maj. opn., ante, 101 Cal.Rptr.2d at p. 733, 12 P.3d at p. 1138.) Indeed, as explained below, I believe that we should distinguish between allowing recovery for correction of serious life- and property-endangering code violations, and repair of defects such as those just listed.
[7] The record indicates that defendants may yet challenge plaintiffs' claims based upon the statute of limitations.
[8] In this regard, codefendant Lyon conceded at oral argument that "it is reasonable to assume that the percentage [of Northridge earthquake homeowners] that did suffer damage probably included a lot of ... homes that did not have Compliance with the [prevailing] safety code[s]."
[9] In the process, the majority rejects plaintiffs' assertion that the cost of repairs is an "accepted measure of damage for construction defects and that plaintiffs could make the cost of repairs certain . . . by voluntarily repairing defects and obtaining a receipt for money spent." (Maj. opn., ante, 101 Cal. Rptr.2d at p. 732, 12 P.3d at p. 1138, italics added.) Although this point was expressly conceded by codefendant Branco Corporation at oral argument, the majority refuses to accept that concession, asserting simply that to do so would confuse "the measurement of alleged damages with the ability of particular facts to support a tort action." (Ibid.) Of course, reasonable certainty in both (i) the need to make repairs, and (ii) the amount of money required to accomplish repairs, must be proved. I view codefendant Branco Corporation's concession as recognizing that, if a homeowner reasonably were to undertake and pay for repairs in order to avoid the risk posed by serious building safety code violations such as the shear wall and fire protection violations here at issue, a court should conclude with a high degree of certainty that the homeowner has suffered injury, and that the third Biakanja/J'Aire factor is met.
[10] In this regard, I find helpful Morris v. Osmose Wood Preserving (1995) 340 Md. 519, 667 A.2d 624, in which the Maryland high court explained that its decisions in this area "reveal a two part approach to determine the degree of risk required to circumvent the economic loss rule. We examine both the nature of the damage threatened and the probability of damage occurring to determine whether the two, viewed together, exhibit a clear, serious, and unreasonable risk of death or personal injury. Thus, if the possible injury is extraordinarily severe, [e.g.,] multiple deaths, we do not require the probability of the injury occurring to be as high as we would require if the injury threatened were less severe, [e.g.,] a broken leg or damage to property. Likewise, if the probability of the injury occurring is extraordinarily high, we do not require the injury to be as severe as we would if the probability of injury were lower." (Id., at pp. 631-632, italics added.)

The majority hypothesizes that distinguishing between "serious" and "minor" defects would "in practice" prove to be difficult and would "likely ... insulate from demurrer and summary judgment virtually all complaints containing allegations of building code violations." (Maj. opn., ante, 101 Cal.Rptr.2d at pp. 735-736, 12 P.3d at pp. 1140-1141.) As noted above, such a distinction has been recognized for more than 14 years (Whiting-Turner, supra, 308 Md. 18, 517 A.2d 336, 345, fn. 5), but the majority fails to cite any authority suggesting that such problems have occurred in practice.
[11] As Justice Mosk explains in his separate dissent, and as codefendant Lyon argued in the alternative in the Court of Appeal, the theory advanced in Judge Posner's opinion in Eljer Mfg., Inc. v. Liberty Mut. Ins. Co. (7th Cir.1992) 972 F.2d 805, provides, by analogy, additional and separate support for recognition of a right to recover repair costs in the present case.
[1] I italicize must because the word prefigures cautionary language in the Eljer opinion. The risk of harm-in Eljer, the "expected failure rate" (Eljer, supra, 972 F.2d at p. 812) "must be sufficiently high ... to induce a rational owner to replace it" (ibid.) or repair it.
[2] Eljer relied on Illinois law in interpreting the insurance policies. The Appellate Court of Illinois later rejected its interpretation. (Travelers Ins. Co. v. Eljer Mfg., Inc. (1999) 307 Ill.App.3d 872 [241 Ill.Dec. 178, 718 N.E.2d 1032, 1039-1041], review granted (1999) 186 Ill.2d 590 [243 Ill.Dec. 569, 723 N.E.2d 1170].) Leaving aside the policies' definition of "property damage," however, Eljer's conclusion favoring the so-called incorporation doctrine-that property damage occurs when defective installation or construction requires that walls be torn out or the like-is persuasive and should be applied here.
[3] Like the Chief Justice, I concur in the majority's conclusion regarding trivial and nonhazardous alleged defects of the type to which the majority refer.